180 P.3d 39 (2008)
218 Or. App. 415
In the Matter of S.L.-C., a Minor Child.
STATE EX REL DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
H.S.C., Inactive Appellant, and
C.L.-I., Appellant.
060487J, Petition Number 060487JA, A135655.
Court of Appeals of Oregon.
Submitted on Record and Briefs November 19, 2007.
Decided March 12, 2008.
Anne Morrison filed the brief for appellant C.L.-I.
Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Judy C. Lucas, Senior Assistant Attorney General, filed the brief for respondent.
Before ROSENBLUM, Presiding Judge, and SERCOMBE, Judge, and CARSON, Senior Judge.
SERCOMBE, J.
Father appeals a judgment authorizing the Department of Human Services (DHS) to pursue adoption as the permanency plan for his daughter, S, who earlier was made a ward of the court.[1] In that judgment, the juvenile court found that DHS had made reasonable efforts to reunify S with her father and that he had not made sufficient progress to allow her to return home. ORS 419B.476(2)(a). Father contends that the evidence does not support changing the permanency plan for S from reunification to adoption. On de novo review, ORS 419A.200(6)(b), we agree and reverse.
We briefly summarize the facts that provide context to father's assignment of error. Father is originally from Guatemala and has lived in the United States for eight years. Mother is developmentally disabled with very low intelligence. Mother has another child, J, from a former relationship. Sometime in the early months of J's life, mother began a relationship with father, and they have lived *41 together since then. Mother and father's daughter, S, was born in May 2006, when J was four years old.
Father worked full time as a landscaper, and the children were under mother's care when father was at work. DHS became aware of risks to the children from mother's cognitive limitations, which affected her ability to care for them. Both children were placed in foster care. When they were taken into custody, four-year-old J was not toilet trained and had significant speech and motor delays, and S was passive and uncommunicative in a way indicative of infant neglect.
DHS filed a dependency petition. Father attended the shelter hearing, and he and mother signed service agreements with DHS. In his service agreement, father agreed to complete a psychological evaluation and to follow all recommendations, to visit both children regularly, and to work with a state agency for in-home skills training. Mother's visits with both children were suspended after she threatened the family of a DHS worker and refused to leave the juvenile court after the shelter hearing. Mother was later arrested for refusing to leave the DHS offices.
The juvenile court took dependency jurisdiction over S on September 1, 2006, based on the allegations in the petition that mother had cognitive limitations affecting her ability to parent S and that father "knew of [mother's] limitations and medical condition and left the child in her care for extended periods of time." Two weeks later, the court committed S to the legal custody of DHS, but returned her to mother and father. The court ordered both parents to comply with the existing service agreements and DHS to develop new service agreements. S was placed back in foster care after mother was arrested for a second time for disruptive behavior at the DHS offices.
On September 20, 2006, father completed a psychological evaluation with Dr. Harper. Harper's report stated that father arrived approximately 40 minutes early for his evaluation, "presented as a polite and cooperative individual who was clearly motivated to do his best," and expressed a normal range of emotions. His depression inventory was consistent with a minimal level of depression that would not compromise parenting ability. Harper concluded that father suffered from "a Dependent/Avoidant Personality Disorder that leads him to be overly passive, compliant, and `long suffering' in his relationship" with mother. Of equal concern was father's inability to confront and override mother, especially in light of her "intellectual, perceptual, and behavioral functioning." Harper recommended that father engage in individual therapy to help him address his dependency issues and stated that father "cannot be a successful parent to [S] and remain in a relationship with his daughter's mother."
On October 26, 2006, the juvenile court held a review hearing and found that DHS had made reasonable efforts to make it possible for S to return safely to the parents' care. The court ordered father to comply with terms of a new service agreement, including obligations to: (1) work with Goodwill Industries to find a safe place to live, find a job, and learn to parent; (2) call the caseworker once a week and report where he was living and working; and (3) work with a therapist at Jackson County Mental Health. Both parents obtained temporary employment and housing through Goodwill Industries.
DHS referred father to the mental health office and was ready to refer him to a parenting class. However, when father failed to appear for his mental health assessment on November 15, DHS learned that father had been placed in custody at the Immigration and Customs Enforcement (ICE) facility in Tacoma, Washington, a few days before and was at risk of being deported to Guatemala. In early December, DHS caseworker Ibarra telephoned ICE, but was not able to talk to father. Later that month, DHS decided to move to a permanency plan of adoption and filed a motion for a permanency hearing.
On January 17, 2007, father called Ibarra twice and left messages. On January 26, they communicated by telephone, and father stated that he was appealing his deportation. A hearing on the deportation was scheduled for February 15, 2007, although father stated that his appeal could take several months. Ibarra told father that, if he were deported *42 to Guatemala, DHS would attempt to work with him there through the consulate to obtain parenting and other counseling services as required by his DHS service agreement. Ibarra gave father her cell phone number. They spoke again on February 5 and 8, and father agreed to contact her once he knew the deportation date. Father also mailed Ibarra his address in Guatemala. Father's review of the deportation decision was denied in March 2007, and he was ordered to be deported.
At the April 26, 2007, permanency hearing, father testified by telephone that he remained incarcerated at the ICE detention facility and had filed an appeal of the deportation order in federal appellate court. Father stated that he was under the impression that, if he waived the deportation appeal and returned to Guatemala, DHS would be required to work with him and eventually return S to him. Father testified that he would consider allowing himself to be deported if that would help him get S back. He said that he would live near his extended family in Guatemala, that they would help him with S, and that he would be able to secure stable employment and housing there. Father again agreed to cooperate with DHS in completing mental health services and parenting classes, even in Guatemala. He stated that he thought that such services were available there, although he admitted that he had not been to Guatemala since 1996.
Father further testified that he had a bail hearing in the deportation matter the next day and stated that he might be released immediately following that hearing. The appeals process would take more than a year, but during that time he could comply with services in Oregon while out on bail. He would return to Southern Oregon to live with mother; if deported, he would want mother to come with him. Either way, he stated that mother would take care of the children at home while he worked seven or eight hours a day and that he would call mother three times per day to check in. He also stated that he would continue to do everything that DHS asked him to do for his child if and when he was able to leave detention.
When father's attorney asked him whether anyone from DHS had told him that living with mother could prevent him from getting S back, father stated:
"A. They haven't told me that.
"Q. Being so that your plans are not engraved in stone, if they told you that by living with her that would prevent you from getting [S] back, whereas if you lived independently you could get her back, would you reconsider your plans to live with [mother]?
"A. What could I do? I love her too.
"Q. * * * [I]f you were in a position to have to make that choice, would you follow DHS directives if that meant getting [S] back?
"A. Give me another option, yes. I would hope that that would not happen.
"Q. And this idea that * * * that may be something you'll have to decide, that's new to you isn't it?
"A. Yes.
"Q. Have you been told * * * that by continuing on fighting your deportation and being detained, that could * * * affect your parental rights?
"A.  told me that.
"* * * * *
"Q. If you're not able to bond out and you have to make a decision between losing your parental rights or allowing yourself to be deported to Guatemala for possible reunification, would you then consider waiving deportation and allowing yourself to be deported?
"A. If that would help me get my [child] back, yes."
Father also testified as to mother's fitness as a parent, stating that she was a good mother and had no difficulties being a parent. He was not aware of mother's threats to DHS employees or her difficulties with controlling J's behavior.
Ibarra testified at the permanency hearing that she had explained to father over the telephone that, "when he is deported, that we will workcontinue to work with him." She stated that, based on the recommendations of the psychological evaluation, DHS was "getting *43 ready to refer him to parenting classes" and that a referral had been made to Jackson County Mental Health. Ibarra stated that father had been cooperative, appeared very motivated in reuniting with the children, was consistent in keeping his visits with the children, and agreed that father conducted "appropriate and positive" visits. She agreed that, if father were deported within 30 to 60 days, she "could still work with him within the time guidelines and potentially return the child to him."
On cross-examination, the attorney for the state questioned Ibarra further:
"Q. * * * Were there any other services that could have been provided to him?
"A. No.
"Q. When evaluating the issue of whether or not a child or children can be safely returned to a parent, do you just look at whether or not they have, in the technical sense, complied with the provisions of their service agreement or do you look at more than that and assess whether or not the parent has benefitted from those services and demonstrated an ability to be able to safely care for the child?
"A. I look at if the parents benefitted from the services they've received and if they internalized what they've learned from that and if they can safely parent the child.
"Q. Do you also look at the input from experts called into the case and whether or not the parents demonstrated the potential for benefitting in a reasonable time period [from] those services?
"A. Yes."
At the conclusion of the permanency hearing, the juvenile court found that all reasonable efforts had been made to eliminate the need for removal of S and to make it possible for her to return to the family home, that S's parents had not made sufficient progress to allow the child to return home, and that S's parents had failed to convince the court that further efforts would lead to successful reunification. The court approved the concurrent plan of adoption.
Father contends that the trial court erred when it determined that he had not made sufficient progress to allow S to return home, despite evidence that he had fully complied with DHS until he was taken into custody by ICE. Additionally, father asserts that DHS did not make reasonable efforts at reunification as required by ORS 419B.476(2)(a).
DHS argues that its obligation to make reasonable efforts at reunification is limited to seeking to cure the reasons for wardship  in this case, father's choice to leave S in mother's care for extended periods of time despite mother's cognitive limitations. Given father's out-of-state detention, DHS submits that it made reasonable reunification efforts under those circumstances. In addition, DHS contends that father had not made sufficient progress by the time he entered detention in November 2006 and still insisted that mother would take care of S while he was working.
ORS 419B.476(2)(a) governs the juvenile court's permanency plan determination and provides:
"At a permanency hearing the court shall:
"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."
Within 20 days of the permanency hearing, the court must enter an order including, among other things, the court's determinations under ORS 419B.476(2)(a) and "a brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing" and "[t]he court's determination of the permanency plan for the ward," i.e., whether and when the ward will be returned to the parent or placed for adoption. ORS 419B.476(5)(a) and (b).
To warrant a change in the permanency plan from reunification to adoption, the court must find that, despite DHS's reasonable *44 efforts to make it possible for the child to return home safely, a parent has not made sufficient progress to enable that to occur. State ex rel Dept. of Human Services v. S.L., 211 Or.App. 362, 372, 155 P.3d 73 (2007); State ex rel Dept. of Human Services v. Shugars, 208 Or.App. 694, 711, 145 P.3d 354 (2006); State ex rel Juv. Dept. v. Williams, 204 Or.App. 496, 130 P.3d 801 (2006). We explained in Williams that "[t]he type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances." 204 Or.App. at 506, 130 P.3d 801 (internal quotation marks omitted). We also consider whether a parent has attempted to make appropriate changes and whether he or she ignored or refused to participate in plans as required by the state. State ex rel Juv. Dept. v. DeVore, 108 Or.App. 426, 432-33, 816 P.2d 647 (1991); State ex rel Juv. Dept. v. Oseguera, 96 Or.App. 520, 526-27, 773 P.2d 775 (1989).
Thus, "[i]f the case plan at the time of the hearing is to reunify the family," ORS 419B.476(2)(a) requires proof at the permanency hearing of "reasonable efforts" by DHS and proof of "[in]sufficient progress" by the parents to allow the child to return home in order to obtain a permanency plan of adoption. The issues in this case are whether the state made reasonable efforts to reunify father and S when father was in ICE custody during the five months immediately preceding the permanency hearing and whether father made "sufficient progress" given those efforts.
We have discussed what efforts are "reasonable" and what progress is "sufficient" on several occasions. In Williams, we reversed a trial court finding that DHS had made reasonable efforts before it proceeded to a plan of adoption. 204 Or.App. at 508, 130 P.3d 801. In that case, a dependency petition had been filed while the father was in police custody awaiting a trial on assault charges, among other things. DHS apparently contacted the father soon after the child was removed; indeed, the father had signed a service agreement while in jail. However, the only action that the agreement required of the father was to communicate with DHS on his release. The agreement failed to specify the services to be made available to the father. At a hearing a few months later, the father's counsel requested that DHS contact the father in jail and noted that he had not been offered any services. The father remained in jail throughout the rest of the juvenile proceedings, with the exception of a two-week period. The father had tried to call DHS from jail, but the collect call was not accepted. Id. at 498-99, 130 P.3d 801.
At a dispositional review hearing while the father was still in jail, his counsel again requested that DHS contact the father and expressed the father's willingness to participate in services. DHS made no contact with the father until it sent him a letter of expectation three months later, reminding him that he should contact DHS on his release and adding that he should "`continue involvement in any available programs at the jail.'" Id. at 499, 130 P.3d 801. The permanency hearing occurred less than four months before the father was scheduled to be released.
DHS argued that it had made reasonable efforts and that the plan for the child should be changed to adoption. We reversed the trial court's conclusion that reasonable efforts had been made, stating that incarceration alone does not excuse DHS's failure to make reasonable efforts at reunification. Id. at 503, 130 P.3d 801. We noted that the type and sufficiency of reasonable efforts depends on the particular circumstances and held:
"The record indicates that, although DHS worked extensively with mother, its involvement with father was virtually nonexistent. Indeed, outside the courtroom, DHS appears to have communicated with father only twiceonce early in the case when father signed a service agreement with DHS (which did not, in fact, offer or suggest any services), and then later when DHS sent father a letter suggesting that he should continue with any services provided in the jail. Otherwise, those two *45 communications merely instructed father to contact DHS on his release."
Id. at 507, 130 P.3d 801.
We concluded that DHS's efforts were not reasonable because the father was incarcerated for a relatively short time, the trial court had lacked information about his relationship with the child, and he was due to be released within four months of the permanency hearing. We declined to "delineate exactly what types of actions would make DHS's efforts reasonable when a parent is incarcerated." However, we noted that DHS could have "engaged in any number of activities that it did not attempt," such as assessing the father's parental strengths, exploring services available during his incarceration, incorporating those into a service agreement, and documenting whether he participated in those services. Furthermore, DHS could have monitored his progress through jail officials, could have looked into whether visitation was possible at the jail, and could have compared his release date with the dependency case timelines and the child's particular needs to determine whether reunification was possible within a reasonable time. Id. at 507-08, 130 P.3d 801.
We again reversed a change in a permanency plan in Shugars, stating that it was unreasonable for DHS to expect parents to master parenting techniques in a short period before a permanency hearing. Although DHS contended that it had made reasonable efforts to reunite the family and that further services would prove fruitless, we noted that most of the parenting services had been made available in the four months immediately preceding the permanency hearing and that the parents should be "afforded further opportunity to demonstrate their ability to adjust their conduct and become minimally adequate parents[.]" 208 Or.App. at 717-18, 145 P.3d 354. We held that the parents had made sufficient progress during that short period and that further efforts were warranted to make it possible for the child to return home. Therefore, the juvenile court had erred in changing the permanency plan from reunification to adoption. Id. at 718, 145 P.3d 354.
Those cases teach that DHS is obliged to undertake reasonable efforts to make it possible for the ward to safely return home based on the circumstances existing during the period prior to the permanency hearing and that period must be sufficient in length to afford a good opportunity to assess parental progress. In this case, father attended the shelter hearing in July 2006 and signed a service agreement agreeing to undergo a psychological evaluation and to visit the children regularly. He complied with both requirements, and the record shows that those visits were appropriate. On October 26, father again signed a court-imposed service agreement, this time agreeing to take advantage of services through Goodwill Industries, to report to the caseworker, and to obtain therapy services from Jackson County Mental Health. Father engaged with Goodwill Industries and was enthusiastic about his progress, and he had appointments for parenting and mental health services in the near future. In mid-November, he was detained in Washington on an immigration hold and was therefore unable to take advantage of the programs offered to him in Oregon. From November 2006 to April 2007, DHS made no attempt to inquire about possible services that could be offered to father at the ICE facility, such as whether visitation could be facilitated there or whether mental health services could be offered. Instead, DHS ceased offering father any services in November 2006, told him that the agency would offer him services if he were deported, and five months later testified that no more services were available and that father had not made sufficient progress.
It is clear from our case law that incarceration alone does not excuse the state from making reasonable efforts. See State ex rel SOSCF v. Stillman, 333 Or. 135, 36 P.3d 490 (2001) (reversing termination as to an incarcerated parent when the father had made progress in drug rehabilitation during his incarceration, completed a drug treatment program, took parenting classes, and undertook other steps to improve his chances of reunifying with his children); see also State ex rel SOSCF v. Freeman, 174 Or.App. 194, 23 P.3d 1009, rev. den., 332 Or. 430, 30 P.3d 1183 (2001). Similarly, when a parent is *46 detained by immigration authorities and DHS makes no inquiry into what services are possible at that location, the mere detention of the parent does not excuse the state from making reasonable efforts by inquiry and arranging the services that might be available under the circumstances. Given the significant change in circumstances precipitated by father's detention and potential deportation, it was not reasonable for DHS to expect father to comply with the existing case plan and service agreement. Without any evidence of an endeavor to inquire into the possibility of father completing his counseling and other requirements while in detention, we are unable to conclude that "reasonable efforts" toward reunification were undertaken by DHS in this case.[2]
Reversed.
NOTES
[1] Mother withdrew her appeal of the permanency judgment.
[2] We are inhibited in our review of the ORS 419B.476(2)(a) requirements of "reasonable efforts" made by DHS and the lack of "sufficient progress" by father because of the absence of an updated service agreement that reflects conditions present during the time immediately before the permanency hearing. ORS 419B.476(5)(a) requires the juvenile court to make findings on the "efforts the department has made with regard to the case plan in effect at the time of the permanency hearing." That case plan includes any service agreement between the parent and DHS. The service agreement will contain treatment and training requirements of the parents designed to remedy the circumstances that resulted in the wardship or to prepare the parents to resume the ward's care. ORS 419B.387. When fundamental facts relevant to family reunification are significantly different during the assessment period (prior to the permanency hearing) from those that existed when the case plan was formulated and the service agreement was struck, such as when either parent dies, becomes incarcerated, or is deported, it may be necessary to modify the plan and service agreement to reflect those changes in circumstances in order for DHS to satisfy its obligation to make "reasonable efforts * * * to make it possible for the ward to safely return home" under ORS 419B.476(2)(a).