209 P.3d 810 (2009)
228 Or. App. 506
In the Matter of R.M.H., a Minor Child.
STATE ex rel. JUVENILE DEPARTMENT OF JACKSON COUNTY, Respondent,
v.
K.D., Appellant.
070002J; A139987.
Court of Appeals of Oregon.
Argued and Submitted on February 6, 2009.
Decided May 20, 2009.
*811 Holly Telerant, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.
Pamela J. Walsh, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.
Before EDMONDS, Presiding Judge, and WOLLHEIM, Judge, and SERCOMBE, Judge.
SERCOMBE, J.
Mother appeals from a judgment authorizing the Department of Human Services (DHS) to pursue adoption as a permanency plan for her son, R, who earlier was made a ward of the court. The juvenile court concluded that DHS had made all reasonable efforts to reunify R with his mother and that she had not made sufficient progress to allow him to return home. ORS 419B.476(2)(a). Mother contends that the evidence does not support changing the permanency plan for R from reunification to adoption. We agree and reverse.
We briefly summarize the history of the case leading up to the August 7, 2008, permanency hearing. We state only the facts necessary to illustrate the bases for our decision, after having reviewed the entire record de novo. ORS 419A.200(6)(b). We note that the trial court did not make any of the findings required by ORS 419B.476 to support the judgment, but mother does not assign as error that failure to make findings. See State ex rel DHS v. M. A., 227 Or.App. 172, 205 P.3d 36 (2009) (reversing and remanding permanency judgment because of the absence of findings required by statute).
Mother's child, R, was born on September 27, 2006. DHS removed R on January 2, 2007, and placed him in foster care.[1] At that time, mother was married to father, who had not completed treatment for the crime of statutory rape and was under a court order not to associate with minors. The juvenile court established jurisdiction over R on February 15, 2007, based on mother's admission of the following allegations of the dependency petition:
"I. ORS 419B.100(1)(e)(D)
"Child's Parents Failed To Provide The Above-Named Child With The Care Guidance And Protection Necessary For Said Child's Physical, Mental Or Emotional Well-Being In That:
"A. Child's Mother, [K.D.], allowed the child to have contact with his father, [M. H.], who is a convicted sex offender who has not completed treatment; therefore the child's welfare is endangered.

*812 "B. Child's father, [M.H.], is a convicted sex offender who has not completed treatment; the child's welfare is endangered."
(Boldface in original.) The dependency petition was filed after DHS learned that father had been at mother's house and that father had taken her children on a hiking trip. The association with father was the only harmful condition or circumstance alleged in the petition under ORS 419B.100.[2]
Following R's removal, mother signed a service agreement with DHS in which she agreed to complete a psychological evaluation, regularly participate in parent-child visits, actively participate in mental health treatment, and comply with all elements of the case plan. In compliance with the service agreement, on March 19, 2007, mother completed a psychological evaluation with Dr. Morrell. Morrell's report concluded that mother's behavior was "consistent with a socially anxious/avoidant individual who has dependent tendencies that lead to self-defeating patterns of behavior." He was "not convinced that the risk in this particular case is significant," noting a lack of concern that "dramatic danger exists" for R. Morrell further noted that mother "appears to be hampered by rather significant attentional disruption" and that "[f]eatures of impulsivity might suggest that she tends to `leap before she looks' as well."
With respect to mother's contact with father, the basis of the dependency proceeding, Morrell stated that
"it is not clear that [mother's] violations are all that serious. She continues to allow exposure of [R] to [father], although the evidence is not particularly compelling that this is an individual who would be a sexual risk to the child. I note in the records that Probation Officer Gaaorian identifies him as a `high risk.' I am uncertain why, given the nature of the offenses occurring 13 years ago confined to statutory rape (which is not typically associated with non-consensual molest of minors, as would be the case with [mother's] children). While it is difficult and of course a bit uncomfortable to `chance' sexual offense matters, the reading of this profile does not rise to the top of those involving sexual exploitation of minors."
Morrell concluded that mother's thinking patterns appear to be "fairly chronic and intractable." He recommended that DHS make clear to mother that future contact between her and father will likely permanently sever her contact with her children and that she should encourage father to complete treatment.
Several months later, on November 7, 2007, DHS completed an initial case plan. That plan explained that the threat to R was that mother allowed contact between R and his father, an untreated sex offender, and that mother did not understand that father presented a threat to R (based in part on her claims that he is innocent of his crimes). The plan set a visitation schedule of twice weekly visits at the Family Nurturing Center. The case plan provided that, as conditions of return, mother must divorce father and "demonstrate an understanding of his sexual predatory nature." In addition, mother "would need to be able to demonstrate a protective capacity by recognizing unsafe individuals." Mother was instructed to "obtain a divorce from [father], actively engage in therapy and cease all defensive behaviors on behalf of [father]."
The initial permanency hearing was held on January 31, 2008, and the juvenile court found that it would be possible to reunify R with mother. Mother was ordered to comply with the service agreement and case plan requirements. By that time, mother had obtained independent housing and completed *813 parenting classes. DHS requested that mother complete another psychological evaluation. The hearing was continued until May 2008.[3]
Mother completed a second psychological evaluation by Morrell on April 21, 2008. His report described mother as "cooperative with the evaluation process overall." Morrell's impressions of mother were not significantly different from those made during the first evaluation. Morrell noted that mother "presented herself as an unreliable reporter" who "does not act her age." He did not "remain any more optimistic at this point regarding [mother's] particular competence for parenting." He recommended that mother continue to work with her counselor in an effort to aid her in "transition[ing] from such self-absorbed activities to more appropriate parenting and a viewpoint directed toward the children rather than her own self-absorbed developmental issues."
In March 2008, mother served a dissolution of marriage petition on father by publication. The divorce became final on June 5, 2008, with the entry of a default judgment.
A second case plan was completed by DHS on July 24, 2008, before the second permanency hearing. The threat identified remained the same, that mother "cannot be a protective parent by keeping her children away from an untreated sex offender." The case plan found that R is "well adjusted" and "developmentally on task."
The new case plan contained the following conditions of return: (1) mother must continue to be able to demonstrate autonomy and independence from her abusive family members (mother and grandmother); (2) she must seek and obtain a divorce from father; (3) she must set boundaries and recognize individuals who are unsafe for her child; (4) she would need to discontinue aggravating the educational development of her child and indicating that her child is in some way sick or developmentally disabled; (5) she would need to develop appropriate parenting skills and stop her pattern of misrepresentation to authority figures; and (6) she would need to put her child's needs above her own and work together with Child Welfare, treatment staff, educational staff, and authority figures.
Before the second permanency hearing, mother and DHS entered into a stipulated agreement in which the state dismissed the mental health allegation that was added to the dependency petition in exchange for mother's agreement to participate in all requested services with regard to that allegation. The state also agreed to provide mother with continuing mental health counseling, a parenting lab, and more hours of visitation with R, in pursuit of the goal of reunification. The state, mother, and child jointly recommended to the court that the goal of reunification continue to be pursued. The court approved the parties' agreement, ordered mother to "faithfully engage in all services specified in the foregoing stipulation and any Service Agreements or Action Agreements," and dismissed the mental health allegation in the petition without prejudice.
The permanency hearing was held on August 7, 2008. At the hearing, mother's attorney noted the sole allegation of parental unfitness in the dependency petitionthat mother failed to provide for R by allowing contact with father. He argued that
"the only allegation is that she allowed contact with this sex offender. There hasn't been any contact with the children for a year and a half. She made contact or he made contact with her in December of [2007]. And she had nohas had no involvement with him except when he contacted her. That's the only allegation that's here. It doesn't sayand in fact we have now dismissed any allegation about mental impairment. And she's been provided services and has done [those services]."
The state responded by arguing that it could not prove that mother was presently unfit. The state expressed doubt that there *814 was any present danger or safety threat to R. Thus, without the justification to file for termination of mother's parental rights, the state was in favor of continuing the plan of return to parent. Counsel for both parents, the state, and child all advocated that the juvenile court allow mother more time to progress to enable the child to safely return home.
The court disagreed with those recommendations regarding mother's progress, referring to her therapist's conclusion that "[mother] now reports * * * that she recognizes * * * that [father] is an untreated sex offender." The court noted that her therapist "feels that [on] one hand Mom has made progress, and on the other hand Mom has showed some very poor judgment that's concerning." The court found that DHS had made all reasonable efforts to make it possible for the child to return safely home and concluded, "I am convinced without any doubt that it is in the best interests of the child to move towards the concurrent plan of adoption." The court found there to be "no reasonable possibility" of reunification and that "there is not a compelling reason for a termination petition not to be filed." Following the permanency hearing, the juvenile court entered a judgment ordering implementation of the concurrent plan of adoption rather than reunification. As noted earlier, the court entered a form permanency judgment that lacked the required statutory findings and determinations. ORS 419B.476(2). This appeal followed.
Mother contends that the trial court erred in ruling that she had not made sufficient progress to allow R to return home, despite evidence that she fully complied with DHS and her case plan. Mother asserts that the court did not sufficiently evaluate whether DHS had made "reasonable efforts." Finally, mother argues that the trial court erred in not finding a compelling reason to avoid filing a petition for termination of parental rights.
On appeal, DHS argues that it met its obligation to make reasonable efforts at reunification and that mother was making only minimal progress. DHS contends that mother's limited progress stemmed from her immaturity and a pattern of denial and deception when dealing with authority figures and that she was not going to achieve the progress required for reunification with R within a reasonable period of time.
ORS 419B.476(2)(a) governs the juvenile court's permanency plan determination and provides:
"At a permanency hearing the court shall:
"(a) If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."
"Thus, if the case plan at the time of the hearing is to reunify the family, ORS 419B.476(2)(a) requires proof at the permanency hearing of reasonable efforts by DHS and proof of insufficient progress by the parents to allow the child to return home in order to obtain a permanency plan of adoption." State ex rel Dept. of Human Services v. H.S.C., 218 Or.App. 415, 423-24, 180 P.3d 39 (2008) (internal quotation marks omitted; emphasis in original); see also State ex rel Dept. of Human Services v. S.L., 211 Or.App. 362, 372, 155 P.3d 73 (2007). "`The type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances.'" State ex rel Juv. Dept. v. Williams, 204 Or.App. 496, 506, 130 P.3d 801 (2006) (quoting State ex rel SOSCF v. Frazier, 152 Or.App. 568, 582, 955 P.2d 272, rev. den., 327 Or. 305, 966 P.2d 220 (1998) (citations omitted)). We also consider whether a parent has attempted to make appropriate changes and whether he or she ignored or refused to participate in plans as required by the state. State ex rel. Juv. Dept. v. DeVore, 108 Or.App. 426, 432-33, 816 P.2d 647 (1991).
In addition, ORS 419B.476(5)(a) and (b) require that, within 20 days of the permanency hearing, the court must enter an order *815 including, among other things, the court's determinations under ORS 419B.476(2)(a) and a "brief description of the efforts the department has made with regard to the case plan in effect at the time of the permanency hearing" and "[t]he court's determination of the permanency plan for the ward," i.e., in this case, whether and when the ward will be returned to the parent or placed for adoption. We again underscore the importance that the juvenile court make the required findings on the basis of the most recent case plan in order to justify its decision and to allow efficient judicial review. H.S.C., 218 Or.App. at 427 n. 2, 180 P.3d 39 ("We are inhibited in our review of the ORS 419B.476(2)(a) requirements of `reasonable efforts' made by DHS and the lack of `sufficient progress' by father because of the absence of an updated service agreement that reflects conditions present during the time immediately before the permanency hearing."); M.A., 227 Or. at 183, 205 P.3d 36 ("By requiring that the court make such findings, the legislature has expressed its intent that the trial court carefully evaluate DHS's decision to change a permanency plan for a child in order to ensure that the decision is one that is most likely to lead to a positive outcome for the child.").
This case presents two issues under that statutory framework. The first issue is whether the evidence shows that DHS made reasonable efforts and mother achieved insufficient progress toward reunification with R. That assessment is made on the basis of the case plan in effect at the time of the permanency hearing and the particular issues of parental unfitness alleged in the dependency petition. The second issue on appeal is whether the court erred in concluding that there was not a compelling reason to avoid filing a petition to terminate mother's parental rights to R.
We begin with the efforts made by DHS. Our cases establish that
"DHS is obliged to undertake reasonable efforts to make it possible for the ward to safely return home based on the circumstances existing during the period prior to the permanency hearing and that period must be sufficient in length to afford a good opportunity to assess parental progress."
H.S.C., 218 Or.App. at 426, 180 P.3d 39. We consider the case plans and necessary progress in relationship to the allegation for the need for dependency in the petition.
The basis for dependency in this case is mother's allowance of continued association between father and R. It is obvious that mother made progress with respect to that reason for dependency. Mother was directed to divorce father by the November 2007 case plan, and she did so. There is no evidence that mother allowed any interaction between R and his father after December 2006. Her contact with father was by telephone, at his initiation. Mother arguably did not comply with the DHS requirement that she change her "thinking" about father and his "sexual predatory nature." There was no evidence in the record, however, of the current nature of father's sexual predations.[4] Nonetheless, mother's disassociation and divorce from father is significant progress toward remedying the barrier to reunification with R identified in the dependency petition and the applicable case plan.
*816 Those efforts of mother are sufficient to require continuing efforts by the state to reunify mother with her son. No other barrier to reunification was identified in the dependency petition. Even assuming that implicit deficiencies in mother's parental qualities are identified in the dependency petition by the sex offender association allegation, mother also had made sufficient progress with respect to other aspects of the initial case plan. The November 7, 2007, case plan specified that mother must obtain a divorce from father and demonstrate an understanding of his sexual predatory nature, demonstrate protective capacity as to R, and actively engage in therapy. At the time of the first permanency hearing less than two months later, mother had obtained independent housing, completed parenting classes, continued to have visits with R, and engaged in therapy. She also took steps to divorce father. By the time of the second permanency hearing, mother had submitted to another psychological evaluation and had continued parenting visits and therapy. Mother was making progress in developing her parenting skills and relationship to R, even if that progress was not moving by leaps and bounds.
On July 24, 2008, DHS adopted a new case plan that required mother to continue to demonstrate autonomy and independence, seek and obtain a divorce, and develop parenting skills, tasks already accomplished or in progress. Two weeks later at the second permanency hearing, the juvenile court determined that mother had no capacity to reunite with R because of her lack of progress. As we have stated before, "it [is] unreasonable for DHS to expect parents to master parenting techniques in a short period before a permanency hearing." H.S.C., 218 Or.App. at 425, 180 P.3d 39 (citing State ex rel Dept. of Human Services v. Shugars, 208 Or.App. 694, 717-18, 145 P.3d 354 (2006) (reversing change in permanency plan where the availability of parenting services had been made available in the four months immediately prior to the permanency hearing and the parents had become minimally adequate in the time allowed)). The two weeks between the new case plan and the permanency hearing was not a reasonable amount of time to measure further progress under the new plan. Thus, mother made sufficient progress under the original case plan, and there was insufficient time to evaluate her progress under the new case plan. The state did not meet its burden to show that R could not be returned to mother's custody within a reasonable time. Accordingly, the trial court erred in changing the permanency plan from reunification with parent to adoption.
Our final inquiry is whether there was a compelling reason not to file a termination petition in accordance with ORS 419B.498. That statute requires that DHS initiate termination proceedings after the child has been in substitute care for 15 of the previous 22 months, a period that R had exceeded at the time of the second permanency hearing. ORS 419B.498 authorizes DHS to defer filing the petition if there exists a compelling reason to do so. That statute provides, in relevant part:
"(2) The department shall file a petition to terminate the parental rights of a parent in the circumstances described in subsection (1) of this section unless:
"* * * * *
"(b) There is a compelling reason, which is documented in the case plan, for determining that filing such a petition would not be in the best interests of the child or ward. Such compelling reasons include, but are not limited to:
"(A) The parent is successfully participating in services that will make it possible for the child or ward to safely return home within a reasonable time as provided in ORS 419B.476 (5)(c);
"* * * * *
"(3) No petition to terminate the parental rights of a child or ward's parents pursuant to subsection (1) of this section or pursuant to ORS 419B.500, 419B.502, 419B.504, 419B.506 or 419B.508 may be filed until the court has determined that the permanency plan for the child or ward should be adoption after a permanency hearing pursuant to ORS 419B.476."
(Emphasis added.)
At the hearing, the state argued that there were no grounds for a termination *817 petition, and therefore the court should continue the plan of return to parent. "[S]uch a request coming from the agency charged with protecting the children is entitled to greater weight than a request coming from a party." State ex rel. Juv. Dept., v. K.L., 223 Or.App. 35, 43, 194 P.3d 845 (2008). DHS acknowledged that mother was complying with all offered services. The juvenile court concluded that mother was not successfully participating in services, and there was no possibility of reunification and therefore no compelling reason existed not to proceed with termination. On appeal, DHS argues that mother's minimal progress was a product of her immaturity and patterns of denial and deception when dealing with authority figures and that therefore she was not "successfully participating" in services. That argument is without merit.
As we have already held, mother was making sufficient progress in reference to the first case plan, and there was an inadequate time to measure her progress under the second plan. We agree with mother that, in this case, allowing the state more time to support reunification would make it possible to more effectively evaluate whether R could safely return within a reasonable time, thus satisfying the statutory preference that children live in their own homes with their own families. ORS 419B.090(5). Just as in K.L., there was a "compelling reason" not to file a termination petition because more time was needed to assess mother's progress under the new case plan. Accordingly, the trial court erred in concluding that it was required to advance to the termination stage and order a permanent plan of adoption.
Reversed.
NOTES
[1] Mother has two older children from a previous relationship that are not the subject of this proceeding. Therefore, we limit our discussion and review to the facts as they relate to R.
[2] Between the first and second permanency hearings, DHS moved to file an amended petition. The motion was granted, and DHS amended the dependency petition to allege that mother "has mental health problems which impair her ability to parent the child." Mother objected, arguing that DHS's allegation lacked specificity and that the allegation of mental health problems arose only after she obtained private counsel and more than a year after she had participated in the psychological evaluation, which was only shared with her a week prior to the amendment. Mother further argued that DHS's argument was spurious, coming only after she had divorced father and had otherwise complied with the requirements dictated to her by DHS. The allegation was later dismissed.
[3] Additionally, mother moved to continue the hearing because of the difficulty she encountered in successfully filing for divorce. In an affidavit in support of the motion, mother's attorney explained that mother had been trying to divorce father for several months but had difficulty in locating him. Father was a truck driver and did not maintain a regular residence. At the time of the motion, mother's attorney had filed for dissolution and had begun service by publication.
[4] There was no evidence in the record that father poses any threat to his child, R, other than by virtue of his status as a sex offender. The record contained evidence that father's offense was statutory rape of a 13- and 14-year-old girl in 1995, when he was 27. That commission of that crime does not necessarily demonstrate a propensity of father to be a threat to his toddler son in 2008. The apparent position of DHS is that mother failed to gain an appreciation that any exposure of R to father would be inconsistent with child's emotional well-being. In the absence of evidence of father's current sexual propensities, it is difficult to evaluate mother's failure to adjust her thinking about father. Compare State ex rel Dept. of Human Services v. A.C., 228 Or.App. 403, 410-11, 209 P.3d 328, 332 (May 20, 2009) (affirming the trial court's dismissal of the termination petition where state relies on the fact that the mother married a convicted sex offender to show her unfitness) with State ex rel. Dept. of Human Services v. L.C.J., 212 Or.App. 540, 546, 159 P.3d 324 (2007) (inferring that the mother's relationship with an untreated sex offender whose sex offense occurred when he was a juvenile and involved a child victim around the child at issue's age, and there was evidence of a likelihood that he would reoffend, made it highly probable that the child would be at serious risk of abuse if returned to mother's care).