Argued and submitted August 19, reversed and remanded October 26, 2011

In the Matter of
F. S., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. M. S.
and D. L.,
*Appellants.*

Linn County Circuit Court
J080389;
Petition Number 09156J

In the Matter of
R. D. and T. D., Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. M. S.,
*Appellant.*

Linn County Circuit Court
J080390, J090155;
Petition Numbers 09157J, 09158J;
A147968

266 P3d 107

Mary Shannon Storey, Senior Deputy Public Defender, argued the cause for appellant N. M. S. With her on the brief was Peter Gartlan, Chief Defender, Appellate Division, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant D. L.

Justice Joy Rillera, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Duncan, Judge.

ARMSTRONG, J.

**ARMSTRONG, J.**

In this dependency case, mother appeals a judgment approving a change in the permanency plans for her three children, F, R, and T, from reunification with mother to adoption.[1] F's father also appeals the change of plan for F.[2] The central issue presented by parents' appeal is whether, in making the assessments required under ORS 419B.476(2)(a)[3]—in particular, the Department of Human Service's (DHS's) "reasonable efforts" toward reunification of the children with mother and mother's "sufficient progress" toward reunification—the juvenile court erred in relying on facts extrinsic to those upon which jurisdiction was established. As explained below, because the juvenile court appears to have relied, at least in part, on facts not fairly encompassed within the grounds for jurisdiction in reaching its conclusion under ORS 419B.476 that a change in plan was warranted, we reverse and remand. Accordingly, we do not reach the parties' other arguments.[4]

Neither parent has requested *de novo* review—which we exercise only in "exceptional cases," *see* ORAP 5.40(8)(c)—and we decline to review the facts in this case under that standard. Therefore, we are bound by the juvenile court's findings of historical fact as long as there is evidence to support them, and we review the court's rulings for legal error. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442, 236 P3d 791 (2010).

We briefly summarize the court's findings from its letter opinion. In November 2009, the three children—F, R,

---

[1] In the juvenile court, there was a separate case number for each child, and a separate judgment was entered in each of those cases. However, the judgments are identical and include all three children; therefore, we consider them as a single judgment on appeal.

[2] The father of the other two children, R and T, did not appear below and is not a party to this appeal. For convenience, when we refer to "parents" in this opinion, we mean mother and the father of F.

[3] That statutory provision is set out below. *See* 246 Or App at 293-94.

[4] As an alternative argument, mother contends that the court erred under ORS 419B.498(2)(b)(B) in failing to determine whether each child was adoptable and, if any child was not, to determine whether another plan was better suited to maintaining sibling relationships. Father advances the alternative argument that the court erred in finding that the change in plan was in F's best interests given mother's progress and F's "questionable adoptability."

and T—were removed from mother's home after T sustained bruises on his face and bottom.[5] At the time, T was one year old, R was three, and F was six. Based on that incident, DHS filed a petition in December 2009 for jurisdiction over all three children. Mother ultimately admitted that "the child, [T,] presented with unexplained physical injuries deemed by medical professionals to have been non-accidental." Father was incarcerated at the time, with an earliest release date of June 2017; he admitted that his incarceration makes him unavailable to assume care and custody of F. Based on those admitted facts, the court ordered that each of the children was within the jurisdiction of the court because each "ward's conditions, behavior and circumstances are such as to endanger his/her own welfare or the welfare of others." The jurisdictional judgments were entered on January 12, 2010.

The permanency hearing that resulted in the judgment that is the subject of this appeal took place approximately one year later, on January 4 and 5, 2011; at that hearing, the court considered mother's motion to terminate foster care placement and DHS's request for implementation of the concurrent plan of adoption for the children. At the time of the permanency hearing, R and T were placed together in foster care; F was in a separate placement because of her sexual aggression.[6]

Focusing on the two issues under the statutory framework of ORS 419B.476(2)(a)—applicable when, as in this case, the case plan at the time of the hearing is to reunify

---

[5] The family's history with DHS antedates that time. As the trial court related in its letter opinion, DHS removed F and R from mother's home in April 2008, and the children were placed in foster care as the result of mother's neglect. At the time, mother was "in the midst of her addiction and treatment" for an ongoing drug and alcohol habit. F was later moved to a separate foster home after initiating some sexual contact with R. T was born in November 2008 and remained with mother. In February 2009, F and R were returned to mother, but all three children were then removed one month later when mother, in violation of the safety agreement with DHS then in place, allowed the father of R and T—an untreated sex offender who had engaged in inappropriate sexual activity with F—to resume living with the family. In May 2009, mother ended that relationship, and the children were returned to her. Jurisdiction was terminated in October 2009 with regard to F and R and in December 2009 for T. Mother also has another son, J, who lives with his maternal grandmother and is not involved in this case.

[6] As noted, during an earlier placement in 2008, F had initiated some sexual contact with R when the two were in foster care together.

the family—the juvenile court concluded that (1) DHS had made reasonable efforts toward reunification but (2) mother had not made sufficient progress to enable the children's safe return.[7] The court agreed with mother that, under the statutory scheme, it was required to consider both DHS's efforts and mother's progress "in relationship to the allegation for the need for dependency in the [jurisdictional] petition." However, the court disagreed with mother's suggestion that jurisdiction in the case was limited to "non-accidental injuries." The court reasoned:

"The basis for dependency in this case is mother's allowance of the abuse of [T] who had severe bruising on his face and his bottom. These bruises demonstrated impressions of adult sized fingers. As one or both caregivers (either [mother] or [mother's boyfriend]) behaved in an impulsive fashion, all three children were at risk in an unsafe environment. The risk to the children was the impulsivity of the adults with which they lived and the unsafe environment.

"* * * Impulsivity could just as easily result in accidental injury, neglect, or intentionally inflicted injuries such as those previously exacted upon [F]. The jurisdiction of DHS and this court was based on the unsafe environment demonstrated by a non-accidental injury but was not limited only to non-accidental injuries. *The limitation on jurisdiction is the limitation of unsafe and detrimental conduct of a parent which necessarily impacted the best interests of the children.*"

(Emphasis added.)

Proceeding within that framework, the court found, with regard to the first issue—*viz.*, reasonable efforts by DHS—that

"DHS made a myriad of services available to [mother]. Those services included but were not limited to family counseling, assistance in finding and treating with a psychiatrist, personal coaching for household cleanliness, personal coaching with regard to her own behavior, supervision and guidance during parenting time, and parental coaching."

---

[7] The court also found that father had not made sufficient progress; that determination is not challenged on appeal.

The court concluded that the evidence thus demonstrated that "reasonable efforts were made to give [mother] every opportunity to succeed" and that "the efforts of DHS aimed at making the home safe and modifying or mitigating [mother's] lapses in judgment were reasonable and appropriate."

Regarding the second issue, the court found that mother was cooperative with DHS, attended all of her hearings, participated in case planning, psychological evaluations, and supervised visitation, "actively engaged in Intensive Family Services" for up to six hours each week, and successfully completed therapeutic drug court and drug treatment. Nonetheless, the court found that she "showed little progress in her ability to protect her children, in her knowledge of care-giving responsibilities, and in her execution of the mundane and day-to-day tasks associated with parenting." The court found that mother's

> "hygiene and parenting skills improved for a brief period of time, however, the unanimous testimony of all counselors, trainers, psychologists, and other social service professionals was that *her progress in hygiene, parenting skills, and her overall judgment was minimal* and the prognosis was not good for return of the children."

(Emphasis added.)

The court noted that, despite one-on-one guidance with housekeeping, mother's home was "consistently filthy." The court also found that mother had "continued to exercise extremely poor judgment and decision making," stating that she had "unnecessarily quit her job"; the court also pointed to an incident in November 2010 in which mother allowed a homeless family to occupy her apartment and, while they were there, a "drunken brawl" broke out in and around her home when children were present. Noting that the police had been called to mother's residence for at least eight other incidents, the court found that the November incident "simply illustrates the likelihood" that mother's "pattern of poor judgment and neglect" continues. Further, the court credited the opinion of Dr. Basham, a psychologist who evaluated mother;

in the court's view, Basham "demonstrated that [mother] suffers from the combined effects of a paranoid personality disorder and a dependent personality disorder * * * [t]he combined effects of [which] are an enduring pattern of behavior that deviates markedly from her parental responsibilities" and for which the prospects for mitigation were "not good and would require years of therapy." Based on those findings, the court concluded that mother "ha[d] not made meaningful progress toward the goals of creating a safe and secure home for her children."

Accordingly, the court denied mother's motion to return the children, granted the state's motion to change the plan to adoption, and entered a permanency judgment implementing the concurrent plan of adoption for all three children.

On appeal of that judgment, mother argues that the juvenile court's conclusion that it was authorized to change the permanency plans based on any "unsafe and detrimental conduct of a parent which necessarily impacted the best interests of the children" is erroneous under *Dept. of Human Services v. G. E.*, 243 Or App 471, 260 P3d 516, *adh'd to as modified on recons*, 246 Or App 136, 265 P3d 53 (2011).[8] In mother's view, that error requires us to reverse and remand for the juvenile court to determine whether DHS's efforts "at assisting mother in ameliorating *the single jurisdictional basis* were reasonable and, if so, whether mother's progress toward ameliorating *that basis* was sufficient." (Emphasis in original.) The state advances two arguments in response: first, that *G. E.* is inapposite, and, second, that, even assuming *G. E.* applies in this case, reversal is not required because mother had "actual notice from DHS as to what she needed to do to address her parental deficiencies." As explained below, we agree with mother that the trial court's reasoning was

_____

[8] Father, to some extent, tracks mother's arguments; he also appears to argue, somewhat inconsistently, that, under the correct test, DHS's efforts were not reasonable because the evidence indicates that the services that DHS provided did not address the physical abuse allegations that formed the basis for jurisdiction, but that mother had made sufficient progress in the services that she received so that the children could be safely returned to her within a reasonable time and, thus, that the judgments should be reversed and remanded "for further proceedings consistent with returning the child to mother." We reject father's separate argument without further discussion.

flawed under *G. E.*, and we reverse and remand for that reason. However, we disagree that the scope of the court's inquiry on remand is as narrow as mother contends.

We begin with a discussion of the applicable legal framework, starting with the statutory provisions governing jurisdiction. The stated policies underlying dependency jurisdiction in Oregon include "safeguard[ing] and promot[ing] each child's right to safety, stability and well-being," ORS 419B.090(3); "guard[ing] the liberty interest of parents protected by the Fourteenth Amendment to the United States Constitution," ORS 419B.090(4); and, other than in cases of extreme conduct under ORS 419B.502, "offer[ing] appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time," ORS 419B.090(5).

The specific bases for dependency jurisdiction are set out in ORS 419B.100(1); as relevant here, the court has exclusive original jurisdiction

"in any case involving a person who is under 18 years of age and:

"* * * * *

"(b)   Whose behavior is such as to endanger the welfare of the person or of others;

"(c)   Whose condition or circumstances are such as to endanger the welfare of the person or of others;

"* * * * *

"(e)   Whose parents or any other person or persons having custody of the person have:

"* * * * *

"(C)   Subjected the person to cruelty, depravity or unexplained physical injury[.]"

We pause to note that, in this case, the court appears to have asserted jurisdiction under ORS 419B.100(1)(b) and (c)—that the children's conditions, circumstances, and behavior are such as to endanger their welfare or the welfare of others—and not on the basis of "unexplained physical

injury" under ORS 419B.100(1)(e)(C). However, the latter, that is, mother's admission that there had been an unexplained (yet nonaccidental) physical injury to one of the children, was the specific "fact" that the court relied on to establish jurisdiction under the former.

Under ORS 419B.809(4)(b), a petition alleging jurisdiction under ORS 419B.100 "must set forth in ordinary and concise language" "the facts that bring the child within the jurisdiction of the court, including sufficient information to put the parties on notice of the issues in the proceeding." The court's task is to determine whether the facts, if proved or admitted, would be sufficient to establish jurisdiction under ORS 419B.100. *See Dept. of Human Services v. D. D.*, 238 Or App 134, 139, 241 P3d 1177 (2010), *rev den*, 349 Or 602 (2011); *State ex rel Juv. Dept. v. Froats*, 117 Or App 467, 470-71, 844 P2d 917 (1992). The court may direct that the petition be amended at any time on the motion of an interested party or on its own motion. ORS 419B.809(6). "If the amendment results in a substantial departure from the facts originally alleged, the court shall grant such continuance as the interests of justice may require." *Id.* Finally, petitions "must be liberally construed with a view of substantial justice between the parties," ORS 419B.857(1), and the court must disregard an error or defect in a petition "that does not affect the substantial rights of the adverse party," ORS 419B.857(2).

We turn next to the permanency process. Generally, a juvenile court must conduct a permanency hearing within 12 months after a child is found within the court's jurisdiction or within 14 months after the child is placed in substitute care, whichever is earlier. ORS 419B.470(2). When the case plan for the child at the time of the hearing is, as in this case, to reunify the family, the court must, among other requirements,[9]

"determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the

---

[9] For example, if the court determines that the permanency plan should be adoption, the court must determine whether one of the circumstances in ORS 419B.498(2) is applicable. ORS 419B.498(5)(d). ORS 419B.498(2), in turn, sets forth the circumstances that negate the requirement that DHS file a petition to terminate parental rights.

ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.476(2)(a). As we explained in *State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 515, 209 P3d 810 (2009), "[t]hat assessment is made on the basis of the case plan in effect at the time of the permanency hearing and the particular issues of parental unfitness alleged in the dependency petition." Specifically, DHS's "reasonable efforts" requirement is "based on the circumstances existing during the period prior to the permanency hearing and that period must be sufficient in length to afford a good opportunity to assess parental progress." *Id.* (internal quotation marks omitted). Parental progress is measured in terms of the parent's efforts "toward remedying the barrier to reunification * * * identified in the dependency petition and the applicable case plan." *Id.* at 516.

In *K. D.*, the basis for jurisdiction was the mother's allowance of continued association between the child and his father, a convicted sex offender who had not completed treatment. *Id.* at 509. Following a second permanency hearing, the juvenile court ordered implementation of the concurrent plan of adoption, finding that there was " 'no reasonable possibility' of reunification" and that moving to adoption was in the best interest of the child. *Id.* at 513. On appeal, we reversed, concluding that the mother's efforts—including divorcing the father and not allowing any interaction between the child and the father in one and one-half years— demonstrated sufficient progress toward amelioration of the only barrier to reunification identified in the dependency petition and that continuing efforts toward reunification were therefore required. *Id.* at 515-16. Thus, we made clear in *K. D.* that a parent's progress under ORS 419B.476(2)(a) must be assessed in relation to the facts of the jurisdictional petition. We also suggested, but did not decide, that parental deficits *fairly implied* by the jurisdictional allegations and identified in the case plan may properly be considered in the analysis. *Id.* ("Even assuming that implicit deficiencies in mother's parental qualities are identified in the dependency

petition by the sex offender association allegation, mother also had made sufficient progress with respect to other aspects of the initial case plan.").

That takes us to *G. E.*, which was decided after the trial court entered the judgment at issue in this case. In *G. E.*, the mother appealed a judgment denying her motion to dismiss jurisdiction and wardship over her daughter and establishing adoption as the permanency plan. 243 Or App at 473. She argued, *inter alia*, that the juvenile court had erred in denying her motion to dismiss because it based its decision on different factual circumstances from those identified in the jurisdictional judgment, which circumstances, she contended, had been ameliorated. *Id.* at 478. We agreed with the mother's arguments, to a point, noting, first, that it is "axiomatic that a juvenile court may not continue a wardship based on facts that have never been alleged in a jurisdictional petition." *Id.* at 479. Explaining, however, that " 'facts' come in many levels of specificity," we rejected the view, implicit in the "highly specific" approach advanced by the mother, that "the court's authority to assert jurisdiction is based on specific facts and *not on the conditions or characteristics that those facts demonstrate or exemplify.*" *Id.* (emphasis added). On the other hand, we also rejected the very general approach advanced by the state:

> "Some of the statutory 'factual' grounds for the assertion of jurisdiction—a child's 'condition or circumstances are such as to endanger the welfare of the person or of others,' ORS 419B.100(1)(c), for example—are so elastic or formless that the department could start the process based on one set of events or conditions (for example, the child is in a home with multiple fire hazards) and ultimately litigate the case based on entirely unrelated ones (parent associates with drug dealers), thereby depriving the parent of constitutionally adequate notice as to what, exactly, he or she is supposed to be doing in order to terminate the authority of the state to act as the child's surrogate parent."

*Id.* at 480.

Confronting that dilemma, we concluded, referencing ORS 419B.857, *see* 246 Or App at 293, that the appropriate distinction is whether the difference between the facts on which the court bases continuing jurisdiction and those

embodied in the jurisdictional judgment "affect the substantial rights of the parent." *G. E.*, 243 Or App at 481 (internal quotation marks omitted). That question, we held, is to be determined according to the following principle:

> "The proven facts depart from the petition so as to substantially affect a parent's rights if a reasonable parent would not have had notice from the petition or the jurisdictional judgment as to what he or she must do in order to prevent the state from assuming or continuing jurisdiction over the child."

*Id.*

Applying those principles to the circumstances in *G. E.*, we concluded that some of the facts on which the trial court had based its permanency judgment were so "different in kind" from those relied on in the jurisdictional judgment that the mother would not have had notice that failure to address them could lead to continued jurisdiction. *Id.* at 483. Among other things, the jurisdictional judgment recited an incident in which the child was present and in the line of fire when a person with whom the mother and child were living threatened people with a shotgun. *Id.* at 482. It also alleged that the home where they were living was "below minimum community standards" and that the mother had a history of substance abuse and had agreed to participate in treatment. *Id.* In denying the mother's motion to dismiss and establishing adoption as the permanency plan, the court found that the mother had not made sufficient progress toward providing a safe home for the child—citing, for example, the mother's failure to properly secure a child seat, failure to prevent the child from getting too close to stairs or into garbage or the litter box, and conduct of allowing the child to attend school with wet diapers, a diaper rash, and no shoes—and that she had not addressed her " 'mental health problems that caused her to neglect her child.' " *Id.* at 482-83. We held that the original jurisdictional judgment fairly "should have alerted mother that she needed to find safe housing where dangerous people did not live or visit and that was not below community standards of sanitation, and that she needed to participate in recommended substance abuse treatment." *Id.* at 482. The judgment would not, however, have alerted her to

the "newly specified safety concerns" upon which the permanency judgment was, at least partially, based. *Id.* at 483 ("In the original judgment, mother was faulted for recklessly exposing [the child] to deadly weapons; here, mother is faulted for inattention."). Moreover, on reconsideration, we concluded that the only remaining ground for jurisdiction—that is, the mother's substance abuse problem—no longer existed. Thus, we reversed and remanded for entry of a judgment dismissing jurisdiction. *Dept. of Human Services v. G. E.*, 246 Or App 136, 265 P3d 53 (2011).

Turning back to the present case, mother argues that, similarly to the mother in *G. E.*, she "could not have inferred from the adjudicated basis for jurisdiction that her 'personality disorder' or her ability to maintain a chaos-free home that satisfies community standards of cleanliness would support ongoing jurisdiction, much less support a change in the children's permanency plans." As a result, mother contends, the case must be reversed and remanded for application of the "proper test." Before analyzing that question, however, we first must dispose of the state's argument that *G. E.* is inapplicable in this case.

The state contends that *G. E.* is inapposite because it involved a motion to dismiss jurisdiction rather than, as in this case, a permanency decision under ORS 419B.476(2)(a). In the state's view, because the court is required to "consider the ward's health and safety the paramount concerns" in making its determination whether it is possible for the child to return home under that statute, "the juvenile court is not limited solely to the facts relied upon in the jurisdictional judgment." (Emphasis and internal quotation marks omitted.) We are not persuaded. The state does not explain why the latter necessarily follows from the former. Moreover, the state's contention that the reasoning of *G. E.* does not apply in the context of a permanency judgment is illogical in any event—if the facts have been determined to be insufficient to support continued jurisdiction, the court lacks authority to act, let alone to decide that adoption is an appropriate plan for a child. Moreover, *K. D.*, 228 Or App at 515-16, discussed in detail above, essentially forecloses the notion that a permanency judgment is not circumscribed by the jurisdictional

judgment. Finally, the state's concern that the juvenile court "cannot simply ignore" serious parental deficiencies (such as mental health issues) that are apparent at the time of the permanency hearing, but that were not the basis for jurisdiction, misses the point of *G. E. G. E.* does not require the court to ignore such deficiencies; rather, it envisions amendment of the jurisdictional petition in those circumstances. 243 Or App at 481 (when the substantial rights of a parent are affected by a change in "facts," "the court must direct that the petition be amended and grant such continuance as the interests of justice may require").

We proceed, then, to the question raised by mother's argument: What is the scope of the jurisdictional basis established in this case and did the juvenile court exceed it in rendering its permanency decision? Again, the sole fact on which the jurisdictional judgment relied was mother's admission that "the child, [T,] presented with unexplained physical injuries deemed by medical professionals to have been non-accidental."

As an initial matter, we agree with mother that the juvenile court's conclusion that the jurisdictional basis properly encompassed any "unsafe and detrimental conduct of a parent which necessarily impacted the best interests of the children" is erroneous under *G. E.* As in *G. E.*, such a "formless" standard would allow DHS to continually shift the goalpost during a dependency proceeding, "thereby depriving the parent of constitutionally adequate notice as to what, exactly, he or she is supposed to be doing in order to terminate the authority of the state to act as the child's surrogate parent." *Id.* at 480.

We disagree, however, with mother's contention that, under the reasoning of *G. E.*, she was only on notice "that she needed to participate in services to prevent any future non-accidental injury to her children" and, therefore, that the court's assessment of the services provided and her progress was similarly confined. First, mother's argument would preclude consideration of "conditions or characteristics" that the specific facts described in the jurisdictional petition or judgment "demonstrate or exemplify," a result that we rejected in *G. E., id.* at 479-80. We concluded that such an

approach would pose "insurmountable practical difficulties"; in *G. E.*, for example, we pointed out that acceptance of that view would require dismissal (or amendment) of jurisdiction if "the shotgun-wielding person had been evicted, [but] had been replaced by a different shotgun-wielding person or by a wanted violent felon," or, if the mother had moved, but "now lives down the block with armed methamphetamine cooks," a result the legislature could not have intended. *Id.*

Moreover, without any explanation of the potential causes for the nonaccidental injury that precipitated jurisdiction, mother's assertion that she was only fairly warned that she needed to participate in services to "prevent future nonaccidental injury" is essentially without content. Mother acknowledged the problem at oral argument, asserting that "unexplained injury" is a unique allegation that generally *requires* the petition to be amended after DHS investigates and determines whether there is a condition of the parent that placed the child at risk for such an injury. That is so, in mother's view, because the allegation is so broad and because it is not tied, in any coherent way, to a condition of the parent at the time of jurisdiction.[10]

We disagree. In *G. E.*, as noted, we concluded that "[s]ome of the statutory 'factual' grounds for the assertion of jurisdiction," in particular, ORS 419B.100(1)(c) (condition or circumstances are such as to endanger the welfare of the child), are "so elastic or formless" that they are insufficient to provide a parent with constitutionally adequate notice as to what he or she needs to do to eliminate the need for jurisdiction. *Id.* at 480. We do not consider the circumstances of this case to be analogous. First, among the "statutory 'factual' grounds" for jurisdiction, that the child was subjected to "unexplained physical injury" is unique in that it is, by its very nature, incapable of further precision. An unexplained injury is just that—*unexplained*. Notwithstanding that imprecision, however, the legislature has seen fit to establish it as an independent and sufficient basis for jurisdiction. In

---

[10] As noted, here, the juvenile court did not assert "unexplained physical injury" as the statutory basis for jurisdiction, *see* ORS 419B.100(1)(e)(C); rather, the unexplained (yet nonaccidental) injury was the fact supporting jurisdiction under other statutory bases, specifically, ORS 419B.100(1)(b) and (c). For purposes of our analysis here, that distinction makes no difference.

this case, moreover, we have additional content: mother's admission that the unexplained injury was deemed to be nonaccidental.

Based on those considerations, we conclude that, in this context—that is, where the jurisdictional judgment is based on an unexplained, nonaccidental injury—the basis for jurisdiction includes those "conditions or characteristics" potentially demonstrated by the specific facts alleged. In other words, it properly encompasses those conditions or characteristics that could have caused the nonaccidental injury. *See id.* at 479. That universe is admittedly broad—it may, for example, point to physical abuse, substance abuse, mental health issues, domestic violence, failure to protect, or other conditions. The universe, however, will narrow as DHS identifies possible explanations for the injury and develops a case plan based on that knowledge. *See K. D.*, 228 Or App at 516 (a parent's progress is assessed with reference to the "barrier to reunification * * * identified in the dependency petition and the applicable case plan").

However, if the parental condition or characteristic is *not* one that fairly can be implied from the facts found in the jurisdictional judgment, then it is outside the scope of the court's jurisdiction, and that deficit cannot be remedied by claims of "actual notice" through case plans or, as the state suggests in this case, letters of expectation. That is so because, as we held in *G. E.*, a petition or jurisdictional judgment must provide a parent with reasonable notice of the deficiencies that he or she must address in order to prevent continued jurisdiction; if it does not, it affects a "substantial right" of the parent—*viz.*, the right to constitutionally adequate notice—and the petition or judgment must be amended before the court can rely on such "extrinsic facts" in its permanency decision.

The juvenile court here determined that its jurisdiction encompassed any "unsafe and detrimental conduct" that affected the best interests of the children and based its permanency decision on concerns about mother's hygiene, parenting skills, and overall poor judgment. The court also relied on mother's mental health problems, which, the court found,

affected her ability to carry out her "parental responsibilities." Although the latter characteristics and conditions—poor judgment and mental health problems—*may* conceivably be implicated in an allegation of unexplained, nonaccidental injury, concerns about hygiene and general parenting skills are not. Thus, although mother was on notice from the jurisdictional judgment that she needed to address any condition that *could have caused the risk of nonaccidental injury* to her children, such conditions would not, in any event, include general parenting skills or poor housekeeping.

Because the court's analysis that DHS had made reasonable efforts to reunify the family and that mother's progress toward that goal was insufficient was based, at least in part, on an erroneous understanding of the scope of the jurisdictional judgment, we reverse and remand.

Reversed and remanded.