Argued and submitted January 22, affirmed March 14, 2007

In the Matter of B. L. and C. L.,
Minor Children.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

S. L.,
*Appellant.*

Washington County Circuit Court
J040581, J040582
Petition Number
01J040581M; A132554

155 P3d 73

James A. Palmer argued the cause and filed the brief for appellant.

Heather A. Vogelsong argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton* and Rosenblum, Judges.

ROSENBLUM, J.

---

* Haselton, J., *vice* Richardson, S. J.

**ROSENBLUM, J.**

Mother appeals from a judgment following a permanency hearing that authorized the Department of Human Services (DHS) to pursue a plan of adoption for her eight-year-old son, C. In that judgment, the juvenile court found that DHS had made reasonable efforts to reunify C with mother but that mother had not made sufficient progress toward meeting expectations for C's return to her home. Mother contends that the evidence does not support changing the permanency plan for C from reunification to adoption. On *de novo* review, ORS 419A.200(6)(b), we affirm.

We begin by summarizing the events leading up to the permanency hearing. On October 6, 2004, police removed then six-year-old C and his then 16-year-old brother B after B reported to a family friend that father had sexually abused him over the course of several years. B had disclosed the abuse to mother, who failed to report the abuse to the authorities or take any other action to protect B. B also reported that mother abused cocaine and marijuana in his presence. Mother and father had been living separately for five months but were not divorced when B and C were removed.

The next day, DHS was granted temporary custody of B and C based on allegations that mother's ability to parent was impaired by her drug use and her inability to protect her children from sexual predators. Mother argued that B's allegations of abuse by father were retaliatory for her calling the police to report that B had attempted to rape her. She admitted, however, that she had "a drug problem." In light of B's allegations, father was charged with sexually abusing B and mother was charged with attempting to deliver a controlled substance to B.

At the first review hearing on November 17, 2004, mother acknowledged the allegation that she used controlled substances in the presence of C, which could impair her ability to adequately care for C. She also acknowledged the allegation that she knowingly failed to protect C from potential sexual abuse by not reporting B's allegations to the authorities. At that time, the permanency plan was reunification

with a parent and the court ordered parenting time with mother to begin as soon as possible.

Following that review hearing, mother submitted to a drug and alcohol evaluation and a psychiatric evaluation by a psychiatrist retained by her attorney. The drug and alcohol evaluator recommended that mother seek treatment. The psychiatrist recommended that mother attend individual therapy and submit to a psychological evaluation. Mother began drug and alcohol treatment, but her counsel advised her to decline to be evaluated by a DHS psychologist. Mother also enrolled in and completed a parenting class shortly before the next review hearing.

A second review hearing was held on April 18, 2005. Mother argued for extended visitation, but DHS explained that C had begun soiling his pants during visits with mother and clinging to his foster mother after visits. Because the visitation supervisor had reported that C's soiling behavior was intentional and that his clinginess after visits was not normal, the caseworker recommended a psychological evaluation for C. Although DHS did not contend that mother was causing the behaviors, the agency requested that visitation remain unchanged pending the results of the psychological evaluation. The juvenile court found that mother was making adequate progress toward reunification with C and that DHS had made reasonable efforts. The court declined to change the visitation until after father's criminal trial and ordered a psychological evaluation for C.

It was at this second review hearing that mother first complained that DHS was treating her unfairly, in keeping with her tendency to see herself as a victim and her failure to take responsibility for her actions. Mother claimed that the caseworker told her that she could not have increased visitation with C because she was "not doing anything," despite her full-time job, stable housing, and involvement in drug treatment and parenting classes. The caseworker denied telling mother that and explained that he had actually told mother that extended visitation was not appropriate because her parenting training was of limited value until she submitted to a psychological evaluation. The caseworker also explained that visits between mother and C were

initially "like two strangers meeting," but he acknowledged that the level of interaction between mother and C had improved over time.

C's psychological evaluation revealed that C was very attached to father but did not appear to have the same kinds of feelings toward mother. Mother's extensive travel for work had meant that she was not C's primary parent prior to his removal by DHS, explaining the visitation supervisor's observation that mother and C initially appear to interact like "two strangers meeting for the first time." Although the level of interaction between mother and C increased as the visits progressed, the caseworker suggested that a parent-child interaction study be done to improve the interaction between C and mother. At that time, C asked to remain where he was rather than be returned to mother's care.

A third review hearing was held on July 26, 2005. DHS contended that the criminal issues involving both father and mother needed to be resolved before visitation increased or active reunification efforts commenced. Mother argued that the pendency of her criminal case did not affect the court's ability to plan for reunification because it was unlikely she would be incarcerated. She reported that she had completed outpatient drug treatment, had continued to participate in recovery treatment, had submitted only clean urinalyses since B and C were removed, and had enrolled in additional parenting classes. Although mother's counsel told the court that she was not planning to reunite with father regardless of the outcome of his criminal trial, C reported after a visit that his parents were not divorcing. The court found that mother had made adequate progress toward reunification and that DHS had made reasonable efforts. A permanency hearing was scheduled to follow mother's and father's criminal trials.

When mother finally agreed to a psychological evaluation following the third review hearing, the results were positive. The psychologist who performed the evaluation, Dr. Dietch, favored reunification between C and mother once the family's legal issues were resolved and recommended appropriate services should reunification take place. He noted, however, that mother's "defensive responding and the

remaining uncertainty of different allegations and legal charges make it difficult to provide a clear prognosis as to whether she can be a viable long-term placement resource for [C]."

After a jury trial in September 2005, father was convicted of sexually abusing B. Mother testified in support of father, stating that she did not believe B. Father was sentenced to 75 months' incarceration. C will be approximately 14 years old when father is released. (B was approximately 12 years old when the abuse began and was 16 years old when he reported the abuse.)

Around the same time, mother pleaded guilty to attempted delivery of a controlled substance to a minor for providing drugs to B. Shortly after her conviction, mother submitted positive urinalyses in violation of her probation.

The first permanency hearing was held on November 2, 2005. The state produced evidence that mother had used cocaine and that she had been jailed for a probation violation as a result. DHS referred mother to a nonoffending parents group with individual counseling options and asked the court to implement the concurrent plan of adoption.

Although mother initially contested the validity of the positive urinalyses and again complained that DHS was treating her unfairly, she later admitted to having used cocaine. She also contended that her contacts with father while he was incarcerated, including putting money in his prison account and accepting his calls, did not demonstrate that she was unable to protect C from him. She continued to maintain that she planned to divorce father, even though she had not yet filed a dissolution petition and C had been told that they were not divorcing. The court concluded that the evidence showed that mother had relapsed on cocaine, and found inadequate progress toward reunification by mother and reasonable efforts by DHS toward reunification. The court did not relieve the agency of its duty to provide services to mother and deferred making a permanency finding.

At the second permanency hearing on January 5, 2006, DHS contended that mother had not made sufficient progress because she had submitted several dilute urinalyses

since her positive urinalysis shortly before the first permanency hearing. Mother claimed she had maintained sobriety and contested DHS's report that she was observed at her nonoffending parents group with red, bloodshot eyes and skin lesions. She argued that her appearance resulted from her busy schedule and allergies, not from using controlled substances. Mother's counsel stated that she had spoken to the group therapist, who said "she observed red eyes and skin lesions that looked like drug use, but all she was making were physical observations. She said she now knows that [mother] has other issues going on."

Mother had still not filed for divorce as of the second permanency hearing, but her counsel assured the court that she was in the process of doing so. Mother nevertheless contended that it was "not realistic nor within the realm of the authority of DHS to require that [mother] have no contact forevermore with [father] (even though she filed for divorce) and that she and [C] have no contact with any family members who believe that [father] is not guilty." The juvenile court found that the visitation logs reflected that "one of the first things mother always asked the child was how was your visit with dad," and that a copetition for dissolution from a spouse who was convicted of sexually abusing a child was "not what I would suggest to be the common response." The juvenile court concluded that the copetition for dissolution and mother's visitation behavior

> "sends a message about a continuing bond between mother and father that is distasteful and * * *, ambiguous. Extremely ambiguous. * * * I don't have a very good understanding of what kind of relationship he had with mom and why it is that he exerts enough control on her that somehow instead of just filing a divorce proceeding somewhere along the line all by her little lonesome in getting her better served, she continues to do this kind of cooperative thing with him. * * * All I have is mom's behavior. Again, it's very ambiguous. I don't see a very protective mother here."

There was also evidence of telephone calls between mother and father shortly after his conviction in which mother indicated that she still loves and supports father and that she was willing to "play along" with DHS to get C back. When asked to explain these telephone calls during her subsequent

psychological evaluation, mother said that her husband used the words "play along" and she may have agreed because she was planning to cooperate with DHS in any event.

C's attorney reported that, until recently, C had been very adamant that he wanted to stay with his foster mother, although at the time of the hearing he felt that he did not want to be forced to make a decision. The juvenile court found that mother was minimally adequate as a visitor and in compliance with the basic case plan but recommended an updated psychological evaluation in light of father's conviction and mother's relapse.

The permanency hearing that resulted in the judgment from which mother now appeals occurred on May 30, 2006. DHS argued for implementation of the concurrent plan of termination and adoption and asked to be relieved of its obligation to provide services, but the agency clarified that it intended to continue to provide mother with services while it proceeded with the termination case.

Mother again argued that she was being unfairly treated by DHS. Specifically, she contended that Dietch was given false information that mother was "cold and detached" with C when neither the visitation records nor the parent trainer's observations supported that characterization of mother. The parent trainer had reported that, although mother and C were not demonstrably affectionate, C was comfortable with her. Mother also complained that Dietch was told that she attended her nonoffending parents group classes while under the influence of intoxicants.

Mother argued for reunification, pointing to her involvement with an emotional-wellness program and her planned involvement in a 12-step program to begin the next week. Mother also reported that she had called regarding individual counseling—over a year after it was first recommended—but that she had not yet found a counselor. Mother claimed that she had maintained sobriety since her relapse, although she had submitted several dilute urinalyses and missed one urinalysis appointment since that time. Mother noted that she had maintained steady employment, she had never missed a visit with C, and her divorce from father had been finalized.

C's caseworker reported that C now wanted to go home with mother. C's foster parent reported to the juvenile court that the more C was told about the case, as had been suggested by C's therapist and ordered by the court, the more rage and behavioral changes he exhibited. C's foster parent also explained that the visits between C and mother "have more than done their job to maintain the bond with her. They have created a bond that was not there in the beginning." The foster parent requested that C have the opportunity to spend real parenting time with mother "that is not just playing so he doesn't think that if he goes back to live with her, he's going to get her undivided attention just playing all the time, which is what he thinks of right now as the contact that he has with his mother."

Mother's second psychological evaluation revealed that she had actually regressed in her ability to protect C because, despite her participation in services and the outcome of father's criminal trial, mother continued to visualize herself as a victim and still doubted that B had been abused. The evaluation reflected an anxiety disorder, elevated scores on a personality dysfunction test in the areas of obsessive-compulsive, anti-social, and histrionic personality features and an elevated score on the Child Abuse Potential Inventory. Dietch noted that "she is likely to attribute problems to her children rather than look at her own role"—just as she had done with respect to B's abuse. Although mother's "cognitive abilities are not an issue and she is capable of learning new material without accommodation," Dietch gave a poor prognosis for safe and stable reunification with C.

At the conclusion of the third permanency hearing on May 30, 2006, the juvenile court approved the proposed change of the permanency plan from reunification to a concurrent plan of termination and adoption. In particular, given Dietch's findings, the juvenile court was

> "concerned that there is a pretty good likelihood that she will have other relationships which could expose [C] to the possibility of victimization, and it seems to me that she continues to not show good insight into what has gone on in the past. I feel very uncomfortable with her as being a safe and protective caretaker for [C]. Under those circumstances, I would say that the ambiguity I felt was resolved somewhat

by listening to the criminal record. I think it became very clear * * * that mother and father had aligned themselves together versus their teenage son, very clearly. * * * It is still really troubling to me that the length of time it took to recognize that it was time for a marriage to end, the length of time it took to admit the relapse behavior last fall and the fact that even after all of this, that there has been no movement whatsoever toward any resolution of the relationship between [B and mother]."

The juvenile court concluded that mother had made insufficient progress toward reunification and stated "[t]he reason she's not parenting [C] is because this Court and others do not believe her. Bluntly, that is the issue, that [mother]'s credibility is quite low." The court ordered a home visit for mother and a parent-child interaction study of mother and C toward the end of the extended visitation period that C's foster mother requested to give C a more accurate idea of what it might be like to return to mother's care.

We review permanency findings *de novo* to determine whether a preponderance of the evidence supports the juvenile court's determination that it is in the child's best interests that the alternate permanent plan be implemented. ORS 419A.200(6)(b); *State ex rel Juv. Dept. v. Brown,* 175 Or App 1, 11-12, 27 P3d 502, *rev den,* 332 Or 558 (2001) (clear and convincing evidence standard does not apply at permanency hearings). We give considerable weight to the juvenile court's findings on issues of credibility. *State ex rel Juv. Dept. v. Geist,* 310 Or 176, 194, 796 P2d 1193 (1990).

The parties agree that ORS 419B.476(2)(a) governs the juvenile court's determination in this case. That statute provides, in part:

"(2)    At a permanency hearing the court shall

"(a)    If the case plan at the time of the hearing is to reunify the family, determine whether the Department of Human Services has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

Thus, to warrant a change in the permanency plan from reunification to adoption under the circumstances described in ORS 419B.476(2)(a), the court must find that, despite DHS's reasonable efforts to make it possible for the child to return home safely, a parent has not made sufficient progress to enable this to occur.

Mother does not contend that DHS failed to make reasonable efforts to return C to her home, but she challenges the juvenile court's conclusion that she has not made sufficient progress toward reunification and that DHS should be relieved of its duty to provide services to her. She argues that her participation in the services offered to her and her level of completion of those services, as well as her divorce from father, support a finding that she has made sufficient progress toward reunification. The state responds that, during the time that C was in DHS's custody, and despite mother's participation in services, mother regressed in her ability to protect C from potential harm and her progress in other areas, such as abstaining from drug use, is suspect.

At the outset, we acknowledge that mother has participated in the services that have been provided or recommended to her, with the exception of individual counseling.[1] Mere participation in services, however, is not sufficient to establish adequate progress toward reunification. Despite her participation in drug and alcohol treatment, parenting classes, and a nonoffending parents group, a preponderance of the evidence demonstrates that mother has not made sufficient progress toward remedying the conditions or conduct that led to the removal of C.

We turn first to mother's argument that the juvenile court inappropriately assumed that a risk to one child means that all of the children of the household are subject to the same risk. Mother contends that her behavior toward B, specifically, failing to protect him from abuse and attempting to provide him with controlled substances, does not demonstrate that she continues to be similarly unable to parent C, especially after her participation in services. She relies on

---

[1] That is a significant omission because the therapist from her nonoffending parents group expressed skepticism that mother will be able to protect C unless she seeks frequent and intensive individual counseling.

*State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 121 P3d 702 (2005) (*Shugars I*), *appeal after remand*, 208 Or App 694, 145 P2d 354 (2006). In *Shugars I*, we held that the juvenile court erred by concluding that the father's conduct in exposing his child K, who had special emotional needs, to severe emotional distress presented a substantial risk of future similar conduct to his other children, T and J. In so holding, we were mindful that K was a child with special needs, while T and J were not.

Although we agree with mother that "it is not appropriate to simply assume that a risk to one child means that all of the children of the household are subject to the same risk," her reliance on *Shugars I* is misplaced. In that case, the father released T and J to a DHS worker pursuant to a court order, but he attempted to abscond with K, thereby exposing the emotionally troubled child to severe emotional distress. Although we cautioned against failing to differentiate between the circumstances facing each child in the home, we acknowledged that "[t]he postulate that 'harm to one child presents a risk of similar or related harm to other children in the same household' makes a great deal of sense—common sense—particularly in cases involving physical or sexual abuse." *Id.* at 315. Nevertheless, we concluded that each child's individual circumstances must be assessed to determine whether that particular child should be subject to dependency jurisdiction, and that such an individual assessment led to different conclusions regarding the risks posed to K and the risks posed to T and J. *Id.* at 315-16.

Unlike *Shugars I*, the record in this case reveals no basis upon which to distinguish the risks B faced from the risks C will face if he is returned to mother's care. Mother's continuing association with father and her inability to acknowledge his sexual abuse of B presents a substantial risk that she will be unable to protect C from future sexual abuse by father, who will be released before C reaches the age of majority. Despite her participation in services aimed at helping her acknowledge B's abuse and develop strategies to protect C in the future, mother continues to doubt that father abused B, and characterizes herself, rather than B or C, as the victim. Consistent with mother's denial of the abuse, her score on the Child Abuse Potential Inventory indicated that

she is more likely to blame her children for problems in the home rather than examine her own parenting role. Mother's resistance to examining her own behavior is also exhibited by her failure to pursue frequent and intensive individual therapy, first recommended by the psychiatrist who evaluated her shortly after the children were removed and most recently identified by the nonoffending parents group therapist as necessary for mother to be able to protect C from future abuse. Mother's failure to gain insight into her own role in B's abuse demonstrates that she has not remedied the very circumstance that made her unable to protect C when he was initially removed from her home.

Although it is true that father poses no risk to C while he is incarcerated, we conclude that there is a substantial risk that mother will either reconcile with father upon his release and before C reaches the age of majority, or that she will become involved in other relationships that could expose C to abuse. We agree with mother that her failure to seek support in the dissolution proceeding does not necessarily indicate that she intends to reconcile with father after his release. But, even if her failure to seek support is seen as a neutral factor in evaluating whether there is a continuing bond between mother and father, mother's conduct undermines her claim that she has terminated the relationship. After father was convicted of abusing B, mother argued that it was not realistic to require that she not see father after his release. Mother's telephone call with father during his incarceration, in which she expressed her love for him, indicates a continuing bond with him and casts doubt on the sincerity of her having learned and benefitted from the services she received. During her psychological evaluation, mother expressed no anger at father but continues to be angry with B. Her unwavering allegiance to father suggests that she intends to reconcile with him after his release or, at the very least, will fail to prevent father from seeing C.

Although mother contests this characterization of her relationship with father, as the juvenile court noted, her credibility on the issue is "quite low." Even if we did not defer to the juvenile court's assessment of her credibility, the record demonstrates that mother is not credible. For instance,

although mother argued to the juvenile court that her positive urinalyses were false positives, she later admitted at a probation violation hearing to having used cocaine. Mother also claimed at her psychological evaluation in April 2006 that she was participating in individual counseling, but she reported to the court at the permanency hearing the next month that she had merely called about counseling. Mother also told the court that she planned to divorce father, while apparently telling C that no divorce would occur. Mother has consistently shown her willingness to make false representations to the court and others when she believes it is in her interests to do so. We conclude that, under those circumstances, it is proper to defer to the trial court's credibility findings—in particular, the finding that mother's claim that she has severed all ties with father is suspect.

Father poses a continuing risk to C because his 75-month sentence for abusing B will expire before C reaches the age of majority. Mother has been unable to acknowledge the risk that father poses to C and continues to blame B for her current circumstances. Her inability to sympathize with B, her choosing to ally with father over B, her inability to acknowledge or take responsibility for her own behavior, and her attention-seeking traits increase the likelihood that she will expose C to abuse, even if she does not reconcile with father. *See State ex rel Dept. of Human Services v. Radiske*, 208 Or App 25, 52, 144 P3d 943 (2006). A preponderance of the evidence demonstrates that, under those circumstances, mother continues to be unable to protect C from the risk of future sexual abuse.

Moreover, we note that mother had not used drugs for, at most, a mere six months at the time of the permanency hearing, and she missed one urinalysis appointment and submitted at least two dilute urinalysis samples after her relapse. While we commend her efforts to maintain sobriety, on this record, we are not convinced that mother has remedied the second condition that led to the removal of C from her home, namely, her drug dependency.

Mother also contends that Dietch was incorrectly told that mother was attending group counseling sessions while appearing to be under the influence of intoxicants.

Although it does appear that the psychologist was given that information in the referral letter, mother explained during the evaluation that she may have appeared intoxicated because she was working long hours and it was allergy season. As the psychologist ultimately concluded that she was no longer using psychotropic substances, the effect of this alleged misinformation on his negative reunification prognosis was minimal. Mother also complains that DHS told Dietch that she was cold and distant during visits with C. Dietch did not rely heavily on this information; his conclusion that there was a poor prognosis for reunification with C does not appear to be based on mother's lack of bond with him, but rather on her relapse and mixed reports about her successful participation in relevant services. We are not persuaded that any misinformation contained in the referral letter affected the psychological evaluation in any significant respect.

■    In sum, we conclude that mother has not sufficiently progressed toward making it possible for C to return to her home in a reasonable time despite her participation in services. Accordingly, we affirm the judgment of the juvenile court to change the permanency plan for C from reunification to adoption at this time.

Affirmed.