Argued and submitted May 21, affirmed July 29, petition for review denied November 24, 2009 (347 Or 348)

In the Matter of S. F. K.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

E. K.,
*Appellant.*

Marion County Circuit Court
J061055;
Petition Number 112006KIL6;
A140745 (Control)

In the Matter of J. M. K.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

E. K.,
*Appellant.*

Marion County Circuit Court
J990969;
Petition Number 112006KIL2;
A140746

In the Matter of J. C. K.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

E. K.,
*Appellant.*

Marion County Circuit Court
J990971;
Petition Number 112006KIL4;
A140747

In the Matter of N. E. K.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

E. K.,
*Appellant.*

Marion County Circuit Court
J990972;
Petition Number 112006KIL5;
A140748

214 P3d 58

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Amanda J. Austin, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

### ROSENBLUM, J.

Mother appeals from four judgments of the juvenile court, which changed the permanency plan for three of her children—JM, N, and S—to adoption and for one of them—JC—to a planned permanent living arrangement. She assigns error to each of the four rulings changing the permanency plans. Mother makes two arguments: first, that Department of Human Services (DHS) failed to make reasonable efforts to reunify the family and, second, that she made sufficient progress to allow the safe return of her children in a reasonable time. DHS responds that, despite its reasonable efforts to reunite the family, mother's deficiencies continue to prevent her from being able to adequately supervise her children or meet their psychological and emotional needs. We agree with DHS and affirm.

## I. FACTS

We take the pertinent facts from the record. In reciting the facts, we give a brief chronological overview of the case. We then discuss in further detail mother's circumstances, each child's needs, DHS's efforts, and the evidence at the permanency hearing.

### A. *Overview of the case*

Mother has six minor children: E, JM, M, JC, N, and S. At the time of the permanency hearing, in November 2008, the children were 16, 13, 12, 10, 9, and 5 years old, respectively. All of the children have some psychological or developmental issues.

DHS first became involved with the family in August 1999, when mother's son from a previous marriage ran away from home and alleged that father had physically abused him. DHS initially took the six minor children into protective custody. Shortly thereafter, those six children were returned home. Two of the children—E and JM—reported that mother's son had sexually abused them.

Thereafter, on November 17, 2006, mother called 9-1-1 to request assistance because her daughter E was "out of control." The police arrived, found the home in an unsafe and unsanitary condition, and arrested mother and father for

criminal mistreatment. The police also referred the case to DHS, and all six children were taken into protective custody. DHS subsequently filed dependency petitions.

On December 1, 2006, mother and father admitted that they had not provided the children with sanitary shelter and necessities. The court found all six of the children to be within its jurisdiction. The court also found that mother and father had made the house safe and sanitary and allowed the children to return home.

Also, at that time, mother had been home-schooling the children, but could not produce documentation of the curriculum. Thus, the court ordered that the children attend public schools. In spring 2007, DHS assisted in enrolling the children in public schools. It also arranged for counseling for the children through Marion County Children's Behavioral Health and for in-home assistance through Options Counseling Services of Oregon (Options), which continued until the permanency hearing.

In November 2007, DHS once again removed the children from the parents' home and placed them in foster care after the children's attorney and a DHS caseworker visited the home and found it to be unsanitary. In addition, the children were out of control, running around, screaming, and playing outside, wearing little clothing and no shoes. E had been refusing to go to school. Also during that visit, JC locked the attorney in the house and hit the windshield of her car with a stick. Mother was unable to prevent or control any of this misbehavior. At that point, DHS arranged for weekly family visits that continued until the permanency hearing.

In February 2008, father died of cancer. Following his death, DHS provided extra visitation for the children and mother, and they received grief counseling through hospice. DHS also provided mother with an in-home parent mentoring program, which she completed in June.

On July 18, 2008, mother admitted to an allegation contained in the original petitions, acknowledging that she had "mental health difficulties and cognitive challenges that impair her memory and requires the state to continue to work services to be able to return the [children]." After the

hearing, JM, N, S, and JC remained in foster care, but E returned to mother's home, and M returned in September. Also in September, DHS referred mother to a family builder program through Options to assist her with E's and M's transition home and to improve her parenting skills.

At the permanency hearing on November 20, 2008, DHS asked the court to change the permanency plan for JM, N, and S to adoption and requested a change in the permanency plan for JC to a permanent planned living arrangement so that he could remain in a therapeutic foster home that receives special funding. According to DHS, mother's neurological problems hampered her parenting skills, the children's special needs required extra parenting skills, and DHS had made reasonable efforts to reunite the family.[1] As noted, the trial court changed the permanency plans for JM, N, and S to adoption and the plan for JC to a planned permanent living arrangement.

B. *Mother's circumstances*

Mother was first evaluated by a psychologist, Dr. Sweet, in March 2000 and again in March 2007. His report of the 2007 evaluation indicated that her intelligence was average, her memory was impaired in the moderate to severe range, and her attention, concentration, and mental speed were normal to mildly impaired. Sweet diagnosed mother with an adjustment disorder and mixed anxiety and depressed mood. He thought that mother might have neurological problems. According to Sweet, mother did not appear to have any significant mood, thought, or personality disorders that would interfere with parenting, although her defensiveness prevented him from obtaining valid results in the psychological and personality testing.

In May 2008, a neuropsychologist, Dr. Wong-Ngan, evaluated mother. Wong-Ngan diagnosed mother with cognitive disorder not otherwise specified and histrionic features. Wong-Ngan concluded that mother's learning and

---

[1] Mother requested a 90-day continuance of the hearing, which DHS opposed and the court denied. Mother assigns error to the trial court's denial of that motion. We reject her assignment of error without discussion.

memory "appear[ed] compromised" and that her memory was "consistently impaired in the moderate to severe range."[2] She was concerned that mother's memory problems could interfere with her ability to parent and that mother appeared to be unaware of those problems (which would prevent her from employing compensatory strategies to minimize their effect on her parenting). According to Wong-Ngan, given the number of children and their special needs, mother was more likely to neglect important parenting issues. Wong-Ngan reported that mother's lack of "psychological insight" and defensiveness could cause her to resist DHS's recommendations. For that reason, she suggested that it was "usually more effective to strategize practical and concrete behavioral changes rather than attempt to increase [mother's] insight."

Mother was distrustful of DHS and believed that it had traumatized the children by placing them in foster care. In October 2008, mother refused to sign an "Action Agreement" that required, in pertinent part, that (1) she continue her mental health counseling; (2) participate in and practice skills that she learned from the family builder program with E and M; (3) attend and participate in all scheduled visitations and, during them, practice parenting skills, ensure child safety, and encourage, lead, and demonstrate positive interactions; (4) gain knowledge and educate herself regarding the children with special needs; (5) abide by the terms of the in-home safety plan for E and M; and (6) participate in a parent-child interaction assessment with Sweet.

Despite having refused to sign the October 2008 agreement, mother appears to have complied with some of its requirements. In particular, Flora, a family builder with Options, reported that mother found and completed a short parenting course on autism, although there is no evidence that she found any community resources for any of the other children's issues. Flora also believed that mother's insight and parenting skills improved while working with her.

---

[2] Wong-Ngan reported that memory problems can be associated with chronic seizures. She knew from mother's records that she has a history of seizures, first as a child and again in 2002. Mother took medication to manage the seizures, which had subsided by 2007.

Mother, E, and M attended regular counseling sessions when E and M moved back home. Mother participated in the parent-child interaction assessment conducted by Sweet, and there is no evidence that she failed to comply with the safety plan for E and M or to continue her individual mental health treatment.

Nonetheless, Stebbins, the family's DHS caseworker, and Sweet both expressed ongoing concerns about mother's inability to adequately parent even E and M, which suggests that mother was not able to successfully apply the parenting skills that she had learned. Specifically, Sweet conducted two parent-child interaction assessments in July and October 2008, shortly before the permanency hearing and after mother had completed parenting classes. In the October 2008 assessment, Sweet concluded that mother was unable to divide her attention among the children, to manage the children, or to work on relationship building. He emphasized that "it is important that the situation for the children get resolved soon" and that a lack of permanency could be more detrimental to the children with special needs. Sweet's conclusion was consistent with Stebbins's assessment that visits were "chaotic," that mother violated the visitation rules (by leaving the house during a visit to go out to buy food), and that, on one occasion, she failed to notice when the five-year-old, S, wandered away and sat behind a parked vehicle. Further, Stebbins expressed concern that mother minimizes the children's special needs, pointing to a statement that mother made in 2008 that JC was not "autistic anymore," which demonstrated a lack of understanding or denial of JC's special needs.

## C. *The children's needs*

The children attended counseling sessions and underwent various evaluations and assessments. In November 2007, Dr. Stoltzfus evaluated JC. In July 2008, Dr. Verlinden conducted a psychological evaluation of JM, and Dr. Willis evaluated N. In September 2008, Erickson, a social worker, conducted a sibling assessment. Erickson made separate recommendations for each child and concluded that "[JM,] [JC,] * * * [N,] and [S] need permanency

now." Finally, all of the children attended counseling sessions with Thomas, a child counselor. Thomas rated each child's special needs on a scale of one to 10 with a rating of 10 indicating the greatest needs. The specific needs of each child are described below. Although the trial court did not change the permanency plan for E and M, we describe their specific needs solely for context.

■ *E*

E was 16 years old at the time of the permanency hearing. Thomas diagnosed her with adjustment disorder with mixed anxiety and depressed mood, post-traumatic stress disorder by history, and parent-child relationship problems. Thomas gave E's special needs a rating of four. Erickson observed that E had issues with being overly controlling of the other five children, with bullying JM, and with mother focusing her attention on the youngest children.

■ *JM*

JM was 13 years old at the time of the permanency hearing. Verlinden concluded that he has many characteristics consistent with Asperger's Syndrome, although she had insufficient information to make that diagnosis. She noted that he had difficulty functioning in social situations, had deficits in his use of language and pragmatic judgment, and displayed compulsive behaviors, including banging his head against a wall. She gave him a "rule out" diagnosis of Asperger's Syndrome and diagnosed him with adjustment disorder with mixed anxiety and depressed mood and a learning disorder not otherwise specified. Thomas diagnosed JM with parent-child relationship problems. When he began attending public school, while living at home, JM had inconsistent attendance, behavioral and social issues, and was placed in a special education class. However, once in foster care, his attendance and behavior improved, and he was integrated into regular classes. Thomas gave JM's special needs a rating of seven or eight. Erickson observed that JM had issues with being bullied and teased by E, M, and N.

■ *M*

M was 12 years old at the time of the permanency hearing. Thomas diagnosed him with adjustment disorder

with combined emotions and conduct and parent-child relationship problems. Thomas gave M's special needs a rating of five. Erickson observed that M has issues with mother allowing E to be too controlling of him and with bullying JM.

■ *JC*

JC was 10 years old at the time of the permanency hearing. Stoltzfus diagnosed him with pervasive developmental disorder not otherwise specified with autistic traits and mild mental retardation but did not believe that he met the medical criteria for a diagnosis of autism. Thomas diagnosed him with parent-child relationship problems and wrote that, in his view, JC did fall within the autism spectrum. Thomas gave JC's special needs a rating of eight or more.

Mother was overwhelmed by JC's disobedient and aggressive behavior, to the extent that it frequently prevented the family from leaving the house because he was uncontrollable in social settings. Stoltzfus concluded that JC's functioning was lower in the chaos of his family home and that he would benefit from a structured and stable environment. Erickson also noted that JC behaved aggressively when all of the children were living at home. JC was moved to a foster placement. Later, because JC's foster mother had difficulty with his behavior, DHS, at her request, moved JC to a therapeutic foster home. Thomas reported that JC's aggressive behavior stopped after he began living in the more structured environment of the therapeutic foster home.

Further, JC's communication skills were delayed, and he has deficits in his cognitive functioning. He initially struggled at school, both socially and academically. At the time of the permanency hearing, JC's behavioral and social issues had improved, and he was integrated into a regular class for 80 percent of the school day.

■ *N*

N was nine years old at the time of the permanency hearing. Gillis indicated that he should be monitored to rule out attention deficit hyperactivity disorder, gave a "rule out" diagnosis of oppositional defiant disorder, and diagnosed him with adjustment disorder with mixed disturbance of emotions and conduct. Thomas wrote that N has been diagnosed

with parent-child relationship problems and encopresis. Thomas attributed the encopresis partially to N's resistance to foster care. N's behavior also initially worsened in foster care, but gradually improved. N's school reported that he has become an excellent student. Thomas gave N's special needs a rating of six or seven. Erickson noted that N and M are particularly close and that N has issues with teasing JM.

■ *S*

S was five years old at the time of the permanency hearing. Thomas diagnosed her with an unspecified adjustment disorder. She initially had difficulty in foster care but improved over time. Her foster mother reported that she would sometimes hurt herself intentionally when she was upset or being disciplined, by hitting and biting herself and running into walls. Thomas gave S's special needs a rating of five. Erickson noted that S is often ignored by her siblings, even when she seeks their attention, and concluded that S was exhibiting the behaviors of a child who is "used to being ignored, neglected[,] and having to meet her own needs."

■ *DHS's efforts*

In 2000, DHS arranged for mother and father to participate in a counseling program through Options that taught parenting skills. DHS also referred the family to Liberty House for training and classes relating to mother's older son's possible abuse of E and JM. In 2006, DHS assisted with enrolling the children in public school and provided testing for JC to qualify him for special services. Between November 2006 and the permanency hearing, DHS provided (1) mother with three referrals for in-home services through Options, (2) mother and the children with regular visitation, and (3) ongoing counseling for the children.

Between November 2007 and July 2008, DHS arranged for psychological evaluations of JC, JM, and N to determine their special parenting needs. DHS referred mother to a parent mentoring service through Options, which she completed in June 2008. In July, it provided a parent-child interaction assessment, and mother and E began attending counseling sessions to aid in E's transition home. Mother and M began doing the same in September, and DHS

ordered a sibling assessment. DHS referred mother to the family builder program through Options when E and M returned home and requested that Flora focus her assistance on the children who were currently in the home. DHS provided another parent-child interaction assessment in October.[3]

With regard to JM's Asperger's Syndrome, JC's autism, and N's encopresis, Stebbins, the DHS caseworker, advised mother to "explore options through DD [DHS developmental disabilities] services and other community resources in order to gain knowledge and educate herself regarding children with special needs." Stebbins explained that DHS did not ask mother to complete more services through DHS after E and M returned home because mother indicated that she was overwhelmed by her current services and asked which services she could quit. Sweet recommended that mother obtain services from community resources because of her distrust of DHS. Wong-Ngan recommended that DHS focus on incremental changes, rather than triggering mother's defensiveness by trying to increase her insight. DHS appears to have followed that advice by advising mother to find community resources to gain insight into the children's needs and focusing DHS-provided services on more concrete changes, with Flora's assistance.

E.  *The permanency hearing*

At the permanency hearing, the state called Sweet, Thomas, and Stebbins to testify, and the evaluations and assessments discussed above were introduced as exhibits. Sweet reiterated his assessment that mother is defensive and could not adequately supervise the children, divide her attention appropriately, or intervene effectively in their disputes. He also testified that the children were in danger when in mother's care because they were out of control and the house was unsanitary. Thomas testified that (1) E and M were having difficulty with their transition to living with mother; (2) there was conflict between E and M that mother was not

---

[3] DHS also notes that the children received additional counseling through hospice and that DHS involved mother in trying to address N's behavioral problems at school.

able to resolve, and (3) JC and JM—the children with the most serious special needs—were doing very well in foster care. Stebbins testified that it was her belief that the children's needs exceeded mother's abilities. She also testified that M was unhappy living with mother because of the amount of control that E has over him and because mother failed to discipline E or intervene in their disputes when E kicked and pushed him or excluded him from their shared bedroom. According to Stebbins, M told her that, if his siblings were adopted, he would want to be adopted with them.

Based on the evidence in the record, the juvenile court concluded that mother was not capable of parenting all six of her children. The court addressed mother's inability to parent the children collectively, making the following findings:

"Dr. Sweet was unable to reach a firm diagnosis because of the denial that [mother] was in * * *. [W]e've had a hard time figuring out what it is that we need to do in order to make sure that she can take care of the children.

"* * * * *

"* * * It's clear to this Court that [mother] cannot parent all six children and that she is, at the current time, hanging on—and I don't want to say by the fingernails because I'm not absolutely sure she is by her fingernails—with regard to the two children at home.

"But the significant weight of the evidence is that [mother] cannot minimally adequately parent [JM, JC, and N], and that if we put [S] in the home with [E] and [M] I believe that all three would fall below the line * * *.

"But I believe, at least at this moment, that [E] and [M] have significant emotional strengths and intellectual strengths that, with continued services, [mother] may be able to minimally adequately parent them. It's also possible that [mother], if she just had [S], could minimally adequately parent [S], but I don't believe that she can do all three and that's what makes it difficult to make findings.

"* * * * *

"So it's troublesome, but I guess as much as I'm struggling with this, that I have to find that at least with regard

to the exhibits I've received and the testimony that I've heard that the Agency's current plan is the one that is most likely to result in mother being able to parent any of her children, and that for her to parent more than one child at a time the way she's parenting currently is the one that's most likely to succeed.

"And I'm not absolutely convinced that that will continue, but at least as of today I will adopt the Agency's plan. * * *.

"* * * * *

"I do find that the Agency has made reasonable efforts. Once again, we get back to the quandary that they were in because it's been sort of a moving target based on what was presented to them, and really their belief that they needed to try to support the family when they were all together when [father] was very ill, and to get the kids in school because the home schooling clearly wasn't working.

"And then once the children were removed, they continued to provide visitations, parenting, the assessments, and I think, based on the evaluations that they were receiving, they provided the efforts that were appropriate given those assessments."

Ultimately, the court changed the permanency plan from return to parent to adoption for JM, N, and S, and to a permanent planned living arrangement for JC.

## II. ANALYSIS

■■ We review the juvenile court's judgments changing the permanent plan for JM, JC, N, and S *de novo* to determine whether a preponderance of the evidence supports the court's decisions. ORS 419A.200(6)(b); *State ex rel Juv. Dept. v. L. V.*, 219 Or App 207, 217-18, 182 P3d 866 (2008). ORS 419B.476(2)(a) governs the juvenile court's permanency plan determination and provides:

"If the case plan at the time of the hearing is to reunify the family, [the court shall] determine whether [DHS] has made reasonable efforts * * * and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

ORS 419B.090(5) provides:

> "[I]t is the policy of the State of Oregon * * * to offer appropriate reunification services to parents and guardians to allow them the opportunity to adjust their circumstances, conduct or conditions to make it possible for the child to safely return home within a reasonable time. * * * [I]t is not always possible or in the best interests of the child or the public for children who have been abused or neglected to be reunited with their parents or guardians. In those cases, the State of Oregon has the obligation to create or provide an alternative, safe and permanent home for the child."

As we summarized in *State ex rel Dept. of Human Services v. Shugars*, 208 Or App 694, 711-12, 145 P3d 354 (2006):

> "[T]o warrant a change in the permanency plan from reunification to adoption under the circumstances described in ORS 419B.476(2)(a), the court must find that, despite DHS's reasonable efforts to make it possible for the child to return home safely, a parent has not made sufficient progress to enable this to occur. We have previously explained that '[t]he type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are reasonable depends on the particular circumstances.' We also consider whether a parent has attempted to make appropriate changes in his or her life and whether parents ignored or refused to participate in plans suggested by the state."

(Citations omitted; footnote omitted.)

■　　We first address mother's contention that DHS failed to make reasonable efforts, then turn to her assertion that she has made sufficient progress.[4] In this context,

> "DHS is obliged to undertake reasonable efforts to make it possible for the ward to safely return home based on the circumstances existing during the period prior to the permanency hearing and that period must be sufficient in length to afford a good opportunity to assess parental progress."

*State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 426, 180 P3d 39 (2008); *see also State ex rel Juv. Dept. v.*

---

[4] Mother also argues that the court erred in changing N's plan to adoption when he is not presently adoptable. We reject that argument without discussion.

*Williams*, 204 Or App 496, 506, 130 P3d 801 (2006) (reasonableness of state's efforts "depends on the particular circumstances").

Here, DHS expended extensive efforts, as described above, 230 Or App at 73-75. The assistance offered before the children were removed—evaluations, parent training, and help enrolling in public school—represented an effort by DHS to prevent the children's removal from mother's home, which we consider in our reasonable efforts analysis. *See State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272 (1998). The assistance offered after their removal—evaluations, education assistance, counseling, in-home services, parent training, and visitations—were all directed at preparing either mother or the children, or both, for reunification. The evaluations of the children allowed DHS to better understand JM's, JC's, and N's special needs—a prerequisite to addressing them, and the evaluations of mother allowed DHS to determine how best to assist her. DHS's assistance in helping enroll the children in public schools, where they could receive special services, helped improve some of their behavioral problems. Further, DHS provided counseling that helped both mother and the children cope with father's death and increased their insight. The in-home services and parent training for mother improved her parenting skills. Finally, mother's visits with the children maintained the family bonds.

As noted by mother, not all of the services that mother obtained are attributable to efforts by DHS. For example, she appears to have completed a course on autism on her own. However, that fact does not indicate a lack of reasonable efforts by DHS. Rather, that was done in response to DHS's recommendation that mother obtain services from community resources. DHS followed expert advice in formulating service goals and activities for mother, based on its understanding of mother's parenting issues.[5] Moreover, at one point, mother stated that she was overwhelmed by services that DHS was offering and asked Stebbins what services

---

[5] We note that, to a certain extent, mother's defensiveness hindered DHS's efforts to determine which services would most help her become able to adequately parent the children.

she could quit. As previously noted, she also refused to sign the October 2008 "Action Agreement" that established goals and expectations for her. Sweet recommended that mother be offered services through her church or attorney, and Wong-Ngan concluded that, rather than making mother defensive by trying to increase her insight, it would be more effective to strategize incremental, concrete, and practical behavior changes. Given that advice, DHS referred mother to a family builder program through Options, where mother worked with Flora to learn and implement practical improvements in her parenting.

In sum, we conclude that it was reasonable for DHS to focus on incremental changes and to suggest that mother seek community resources to gain insight into her children's special needs. DHS's efforts to prevent removal of the children from mother's home, and then to reunite the family after the removal, were reasonable. We further conclude that the period of time during which DHS did so was "sufficient in length to afford a good opportunity to assess parental progress." *H. S. C.*, 218 Or App at 426.

We turn to whether mother has made sufficient progress to allow reunification within a reasonable time. In *Shugars*, we characterized our inquiry as a determination of whether "the parents' behavior * * * evidenced a lack of sufficient continuing progress," with our "predominant consideration" being the children's "health and safety." 208 Or App at 712. In *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 372, 155 P3d 73 (2007), we stated that "[m]ere participation in services * * * is not sufficient to establish adequate progress toward reunification."

In July 2008, mother admitted to the allegations in the jurisdiction petitions that her cognitive difficulties impaired her memory and that she needed the state's assistance in parenting. We conclude that, in November of that year—the time of the permanency hearing—she remained unable to adequately supervise her children when all six were under her care or to meet their psychological and emotional needs. Despite DHS's efforts, in the parent-child assessment conducted in October 2008, one week before the permanency hearing, mother was unable to adequately

supervise all the children together. When mother is with all six children, E is forced to act as a parent and to take responsibility for supervising the children, three of whom have serious special needs. That in turn creates a chaotic environment where the siblings harm each other both physically and psychologically. The sibling interaction and mental health assessments demonstrate the following effects on the children from the family dynamic of mother with the six children: (1) E is ignored by mother and forced to parent her siblings, which neglects her needs as a child; (2) JM is bullied by his siblings; (3) M is frustrated with the amount of control that E has over him; (4) JC acts aggressively and destructively; (5) N has significant emotional and behavioral issues; and, (6) S self-harms and shows signs of "being ignored, neglected[,] and having to meet her own needs." To the extent that mother was making progress, that progress was insufficient.

The special needs that JM, JC, and N have increased the detrimental impact of mother's less-than-minimally adequate parenting skills. Sweet and Stebbins both expressed concern that mother was in denial with respect to the seriousness of their needs and believed that the chaotic environment in mother's home had a detrimental impact on them. Erickson concluded that "the children's needs collectively are so high that even skilled parents would have extreme difficulty parenting all six children together." JM, JC, and N struggled in school while living with mother, but their attendance and performance both socially and academically improved dramatically when they were living in their respective foster homes. Thomas, in working with JC, noted that his behavioral problems had diminished substantially while living in his therapeutic foster home.

Thus, the final question is whether mother's progress would have continued at a sufficient pace to allow the children to return to her home "within a reasonable time." ORS 419B.090(5). The record does not support the conclusion that it would have. Although Flora's assessment indicates some improvement in mother's parenting skills, only E and M lived with mother when Flora was working with her. Thus, Flora's assessment does not provide support for the conclusion that mother would be a minimally adequate parent with

all six children in the home. Even with only two children living in the home, mother's progress was limited—mother allowed E to be too controlling of M and failed to intervene in their disputes, even when E became physically aggressive with M. Sweet's testimony indicates that, whatever progress mother may have made with E and M, that progress did not carry over to situations in which the whole family was together. His testimony about the October 2008 parent-child interaction assessment demonstrates that, at the time of the permanency hearing, mother's ability to parent all of the children together had not improved significantly since July 2008. Mother's refusal to sign the October 2008 "Action Agreement" and her request to Stebbins to quit services also suggest that her willingness and ability to incorporate DHS's parenting training programs were limited and that her progress was likely to be insufficient to allow the children to return to her home within a reasonable time. Moreover, Erickson concluded that "[JM,] [JC,] * * * [N,] and [S] need permanency now," and Sweet concluded that it was "important" that "the situation for the children get resolved soon."

In sum, even with responsibility for only two of the six children—those whom Thomas had identified as having the lowest levels of special needs—mother had difficulty applying the parenting training that DHS had provided. The evidence demonstrates that she had even greater difficulty adequately parenting all six children. Given Erickson's recommendation that the children need permanency "now" and Sweet's conclusion that it was important that the situation be resolved "soon," we conclude that the preponderance of the evidence demonstrates that it was unlikely that mother would make sufficient progress to allow the other four children to be returned within a reasonable period.[6] *See S. L.*, 211 Or App at 372 (affirming where "a preponderance of the evidence demonstrates that mother has not made sufficient

---

[6] We note that father's death in March 2008, after a relatively brief illness, dramatically affected mother and all six children. Although we did not address mother's assignment of error regarding her request for a continuance of the permanency hearing, *see* 230 Or App at 68 n 1, we note that it is very difficult to assess the actual impact of father's illness and death on mother's parenting progress at the time of the permanency hearing. Because of that, we urge DHS to continue to provide services to mother at a level that ensures its continuing ability to monitor her progress in that regard.

progress toward remedying the conditions or conduct that led to the removal of" her child). Thus, we conclude that the juvenile court did not err in changing the permanency plan for JM, JC, N, and S.

Affirmed.